Michael GINAITT

v.

Howard HARONIAN, Individually and in his official capacity; Donald S. McKiernan, Individually and in his official capacity; Oscar Shelton, Individually and in his official capacity; Walter Manning, Individually and in his official capacity; Charles J. Donovan, Individually and in his official capacity; James Quirk, Individually and in his official capacity; Gerald D. Gregory, Individually and in his official capacity; Marshall P. Martin, Individually and in his official capacity; James C. Hovey, Individually and in his official capacity; Board of Public Safety of the City of Warwick; City of Warwick, Rhode Island.

Civ. A. No. 92–0385 P.

United States District Court,
D. Rhode Island.

Nov. 18, 1992.

Ina P. Schiff, Providence, R.I., Maureen Conroy, Cranston, R.I., for plaintiff.

Marc DeSisto, Carroll, Kelly & Murphy, Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

In this action, the plaintiff, a City of Warwick (City) fireman, claims that his disability pension payments and medical benefits were arbitrarily terminated in violation of the First, Fifth and Fourteenth Amendments of the United States Constitution. In addition, the plaintiff presents pendent state claims, including intentional infliction of emotional distress, tortious interference with employment relations, slander, and libel.

### I. *Background*

In August of 1985, the plaintiff suffered a job-related injury while serving as a City fireman. In July of 1986, he was retired from active service and awarded a line of duty disability pension pursuant to Section 7–75 of the Warwick City Code.[1] This entitled him to sixty-six and two-thirds pay, tax free.

In May of 1988, the plaintiff moved to Florida where he engaged in and successfully completed a training program for appointment as a police officer with the Pun-

ta Gorda Police Department. He served as an unpaid volunteer until September of 1991 when he was hired for full-time employment; prior to this appointment he made a full disclosure to the Punta Gorda authorities, of his physical condition and retirement status as a City of Warwick fireman. As a consequence, Punta Gorda authorities contacted the Chief of the Warwick Fire Department and discussed the plaintiff's disability status. On October 7, 1991, the Chief mailed to the Punta Gorda Police Department a completed form detailing the plaintiff's record of employment and injuries received in the line of duty. These forms were completed by the Chief's secretary who notified defendant Oscar Shelton that the plaintiff was working as a police officer in Florida.

Defendant Shelton works in the personnel department of the City of Warwick as a human resources accountant. He is responsible for reviewing police and firefighter disability claims and is the liaison between the Board of Public Safety ("Board") and the insurance administrator for the police and fire disability program. He must investigate status changes in pensions. On receipt of the information that plaintiff was working as a police officer in Florida, he discussed the matter with the City labor lawyer, defendant John Harring-

---

1. The Code provides that:

    Whenever an officer or member of the permanent fire department shall become unfit to perform active duty by reason of mental or physical infirmity, or other causes, the board of public safety may place such officer or member upon the pension list and thereafter he shall be paid for the remainder of his life, semi-monthly such sums as are hereinafter designated. However, no officer or member who has failed to attain the age of fifty-five (55) years, shall be placed upon the aforesaid pension list unless and until three (3) qualified physicians as designated by the board of public safety, shall have certified in writing to such board that such officer or member is permanently incapacitated. Such officer or member shall submit to such periodic examinations as the board may specify for the purpose of determining any change in his mental or physical status.

    Upon the determination of three such physicians that the mental or physical incapacity has been corrected and upon their recommendation to the Board that such officer or member is able to return to active duty, the Board

    shall place said officer or member on active duty status. An officer or member, so classified, shall return to active duty forthwith. If such officer or member shall refuse to return to active duty forthwith, he shall then be classified as resigned in accordance with the terms of Section 7–81.

    Firefighter and police pensions are determined and administered through the Warwick Board of Public Safety, an autonomous body which has ultimate authority in determining the granting or non-granting of such pensions. The Board consists of three members who are appointed by the Mayor with fixed terms. The present members were in office at the time the present grievance arose; they are defendants Howard Haronian, Chairman; Marshall Martin, and James Hovey. The Board receives legal opinions orally and in writing from both the City Solicitor's office and the labor lawyer for the City through administrative assistants of the City or by written letter. The Mayor's office and his staff have no authority over the Board or its members, though the office of the Mayor, it was conceded at trial, can make recommendations.

ton, and was advised that before taking any action, the plaintiff's status as a full-time police officer should be verified. Thereupon, Shelton, in January 1992, contacted the insurance administrator, Frank B. Hall & Co. ("Hall") to conduct an investigation to determine if indeed the plaintiff was employed as a full-time police officer, since Shelton felt the physical requirements for a police officer and a firefighter were so similar as to cast doubt on the plaintiff's disability for which he was receiving a pension.

Hall is an independent private business entity under contract with the City to provide Claims Management Services pertaining to work-related disability claims filed by the City's police and firefighter employees. It provides complete claims investigations, contact with medical providers, and assistance with setting up independent medical examinations so that a claimant's eligibility for a disability pension can be evaluated. Subsequently, Shelton received from Hall verification of the plaintiff's new employment. Shelton discussed this information with Harrington, who advised that it would be appropriate to immediately suspend the plaintiff's pension, provided the plaintiff was afforded notice and a post-suspension hearing. Shelton appraised defendant McKiernan, the City Treasurer, and defendant Gregory, the Administrative Assistant to the Mayor, of the situation. McKiernan relayed the information to the Mayor.

On February 11, 1992, the Board of Public Safety met for one of its regularly scheduled sessions. At this meeting, Shelton, who was present, advised the Board of all that had transpired concerning the plaintiff's employment as a full-time police officer, including Harrington's opinion. The Board then voted to suspend the plaintiff's pension and directed Hall to proceed with its investigation and arrange to have the plaintiff examined by three doctors. The plaintiff's medical benefits were stopped and a bank account attached. Hall assigned its employee, Joseph Nugent, to

service this account. Nugent engaged a Florida agency to conduct the investigation. The agency scheduled appointments with three Florida physicians and so notified the plaintiff on or about February 20, 1992. At the request of the plaintiff, a fourth doctor was substituted for one of the three that had been selected. Nugent forwarded to each of the Florida doctors all available medical records, a Warwick Firefighter job description, an explanation of available light work in the Warwick Fire Department, together with a blank medical form questionnaire to be completed and returned. All of these reports when completed and returned to Nugent were forwarded to Shelton.

Two of the doctors found that the plaintiff was fit to return to duty as a firefighter; one found he was disabled. It is undisputed that the three doctors did not unanimously determine "that the mental or physical incapacity had been corrected [and recommend] to the Board that [the plaintiff was] able to return to active duty." Section 7–75, Warwick City Code. Nevertheless, the plaintiff's pension was not restored because the defendants [2] felt there was need for further investigation.

The plaintiff had previously been examined by his own physician, who found him disabled and so stated in a letter. The plaintiff, to bolster his position, forwarded this letter to the Board. Defendants McKiernan and Shelton noted from the heading of the letter that the plaintiff's private physician and the examining physician, retained by Hall, who had also found the plaintiff disabled, practiced in the same office. McKiernan and Shelton decided the Board could reject this latter physician's opinion as suspect. Consequently, the plaintiff was asked to see a fourth doctor in Rhode Island. The plaintiff agreed to this arrangement and the defendants paid for the air flight from Florida to Rhode Island. The plaintiff did not keep his appointment scheduled for June 16, 1992. Instead, he retained counsel. To date, plaintiff's pension remains suspended and the

---

**2.** I use the word "defendants" generically throughout this opinion. The liability of each individual defendant will be determined *infra* in Parts IV and V.

Board has not scheduled any post-deprivation hearing. The defendants concede that the Board's revocation action of February 11, 1992, was not authorized by the Code. Defendants' Pre–Trial Memorandum at 5.

The plaintiff states that he first learned of the suspension from a newspaper reporter who told him the City was going to take away his pension. On February 13, 1992, the plaintiff voluntarily resigned from the Punta Gorda police force believing it would help safeguard his pension.

## II. *Discussion*

### A. *Claims*

Sorting out plaintiff's specific claims is no simple task. Plaintiff has alleged a mixture of violations pursuant to 42 U.S.C. § 1983 under the First, Fifth, and Fourteenth Amendments of the United States Constitution, including procedural and substantive due process, equal protection, and "takings" claims. In addition, plaintiff abstrusely alleges § 1983 claims for "civil rights" violations, "post-complaint retaliation," and creation of a "hostile employment environment." Plaintiff has also raised pendent state claims for intentional infliction of emotional distress, invasion of privacy, tortious interference with employment relations, slander, libel, as well as larceny and obtaining money under false pretenses pursuant to Section 9–1–2, R.I.G.L. Among other things, Plaintiff seeks: (1) injunctive relief directing the City to reinstate his disability pension and medical coverage; and (2) the awarding of compensatory and exemplary damages.

At the outset, this Court can dispose of the bulk of plaintiff's claims. Plaintiff presented insufficient evidence at trial to support a judgment in his favor on the state claims for intentional infliction of emotional distress, interference with employment relations, larceny, obtaining money under false pretenses, invasion of privacy, libel and slander. On the constitutional side, plaintiff did not offer sufficient proof of a First Amendment violation, a Fifth Amendment "takings" claim, a civil rights conspiracy, post-complaint retaliation, or creation of a hostile work environment stemming from defendants' conduct. Therefore, all of these claims are dismissed. This leaves before the court only plaintiff's due process and equal protection claims under the Fourteenth Amendment.

### B. *Due Process*

Plaintiff asserts that the termination of his pension payments and medical benefits violated his due process rights. There are two separate elements of this claim: procedural due process and substantive due process. Although plaintiff's voluminous filings are far from crystal clear, I can decipher the following arguments. With respect to procedural due process, plaintiff alleges that defendants deprived him of a "substantial property interest without pre-deprivation notice, hearing or determination that such hearing was nonfeasible." Plaintiff's Memorandum on the Availability and Adequacy of State Law Mandamus at 1. On the substantive due process component, plaintiff argues that the "arbitrary and capricious" actions of the defendants in revoking his pension and benefits violated his constitutional rights. Specifically, plaintiff alleges that the "Defendants never adopted any objective, written, ascertainable standards for pension decisionmaking or review, and the evidence is that Defendants and their agents tampered with and manipulated both the pension process and results to achieve discriminatory effects." Plaintiff's Supplemental Pretrial Memorandum at 14.

I realize that the dividing line between substantive and procedural due process is fuzzy. Some distinctions, however, can be articulated. As Judge Selya has artfully stated, when confronted with a procedural due process claim, "the proper focus must be on the manner in which the state has acted: 'how and when' the alleged deprivation was effected." *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). "In contrast, a substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that

the government's conduct, regardless of procedural swaddling, was in itself impermissible." *Id.* For clarity, I will discuss the two due process claims separately.

### 1. *Substantive Due Process*

In support of his substantive due process contention, plaintiff cites no cases directly bearing on the termination of pensions or medical benefits. Rather, he principally relies on language from the First Circuit's decision in *Newman v. Commonwealth of Massachusetts*, 884 F.2d 19 (1st Cir.1989), *cert. denied*, 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990). The precise issue in *Newman* was whether a tenured professor's censure for plagiarism by her university violated her substantive and procedural due process rights. The First Circuit never reached the merits of the plaintiff's due process claims, ruling instead that the university officials were entitled to qualified immunity. But the Court reiterated that the First Circuit had "clearly established ... that school authorities who make an arbitrary and capricious decision significantly affecting a tenured teacher's employment status are liable for a substantive due process violation." *Id.* at 25. Additionally, the Court noted that most circuit courts that had considered the issue, including the First Circuit, had held either explicitly or implicitly that the "Fourteenth Amendment protects public employees from arbitrary and capricious government action affecting their employment." *Id.*

The plaintiff in our case also cites a previous, unpublished decision of this court involving firefighter disability pensions in the City of Warwick. In that case, *Waterman v. Members of the Board of Public Safety for the City of Warwick*, C.A. 77–0222, slip op. (D.R.I. July 15, 1981), *aff'd without opinion*, 676 F.2d 681 (1st Cir. 1982), I found that Warwick firefighters had a constitutionally-protected property interest in their pension payments, and that the decision-making process of the City's Board of Public Safety had to conform to at least minimal standards of procedural due process in determining the amount of pension awards.

The plaintiff in *Waterman* was first awarded a disability pension of 50% of his salary under a system in which members of the Board of Public Safety employed a standardless, subjective process to determine entitlements. Before the plaintiff filed his suit, however, the City of Warwick enacted a new pension ordinance which adopted a flat rule of 66⅔% of the firefighter's salary. This Court concluded that the new ordinance was facially valid. Further, this Court found that the Board's application of this new law to the plaintiff satisfied due process and equal protection standards. Still, I held that the awarding of the original pension violated the plaintiff's constitutional rights. As I stated: "Whatever else the procedural component of the Due Process Clause may require, in this or in other contexts, at an irreducible minimum 'due process requires that we be ruled by law and not be fiat.'" *Waterman*, slip op. at 20 (quoting *Baker–Chaput v. Cammett*, 406 F.Supp. 1134, 1140 (D.N.H.1976)). "'[T]he establishment of written, objective, and ascertainable standards is an elementary and intrinsic part of due process.'" *Id.*

▇ The defendants do not directly respond to plaintiff's substantive allegations. Instead, the mainstay of the defendants' case is their argument that plaintiff's overall contention of due process deprivation must fail since there are adequate post-deprivation remedies in Rhode Island. For support, they cite to *Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d 996 (1st Cir.1992), *Lowe v. Scott*, 959 F.2d 323 (1st Cir.1992) and *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). These case will be discussed *infra* in my discussion on procedural due process. For the moment, let me state that because the plaintiff has alleged a deprivation of substantive rights under the due process clause, he may bring this § 1983 action into federal court regardless of the state remedies available. *Zinermon*, 494 U.S. at 125, 110 S.Ct. at 983.

Turning to the merits of plaintiff's claim, I must observe that the First Circuit has not been receptive to substantive due pro-

cess challenges to state or local administrative agency action. The First Circuit has warned, for example, that "even the outright violation of state law by local officials 'is a matter primarily of concern to the state and does not implicate the Constitution'—absent 'fundamental procedural irregularity, racial animus, or the like.'" *Roy v. City of Augusta, Me.*, 712 F.2d 1517, 1523 (1st Cir.1983) (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.) *cert. denied*, 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982)). More generally, the First Circuit has noted that substantive due process does not protect all individuals from actions by the government that curtail liberty or injure property in violation of some law. *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 31 (1st Cir.1991), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 1151, 117 L.Ed.2d 400 (1992). Rather, substantive violations arise where governmental power is "being used for purposes of oppression," or where there is an "abuse of government power that shocks the conscience," or where government action is "not sufficiently keyed to any legitimate state interests." *Id.* at 31–32 (quoting *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 943 (D.C.Cir.1988)).

■ Despite these formidable legal hurdles, I am persuaded that the defendants' actions violated the plaintiff's substantive due process rights. Uncontradicted testimony showed that the defendants blatantly disregarded the City Code in revoking plaintiff's pension. This was not a case of misunderstanding. There is no question that the Board knew that absent the unanimous finding by three physicians that the plaintiff's disability "had been corrected" and he was "able to return to active duty," his pension could not be revoked under the statute. Thus, the Board consciously deviated from the requirements of the City Code to injure and retaliate against this specific plaintiff. This clearly show the intentional and discriminatory nature of defendants' actions.

In addition, this Board has no "objective, written and ascertainable standards" for determining disability pension issues, particularly in determining job task requirements. While this finding may be more closely akin to the procedural prong of the due process clause, *see Waterman, supra,* the application of this arbitrary scheme by the Board implicates substantive due process as well. Board members employ a subjective approach, treating each case as their emotions, engendered by the case at hand, motivates them. At various times, as in this case, they have departed from the statutory requirements. Though Rhode Island law required the City to comply with the physical and medical standards of the National Fire Protection Association, the Board did not adopt a compliance plan as required by law until the trial of this case. It ignored these standards in deciding pension issues. It also never advised consulting physicians—including those examining the plaintiff—of the need to comply with these national standards. Evidence also demonstrated that there are no procedures, policies, ordinances, or practices in the City of Warwick providing for appeals of decisions by the Board of Public Safety.

In analyzing the conduct of the defendants, I must also note that there are no restrictions on post-retirement personnel from working, except doing so for the City of Warwick. It follows that the plaintiff violated no rules or regulations in seeking employment as a police officer in Florida.

To justify their summary suspension of the plaintiff's pension, the defendants make much of their alleged logical conclusion that it was incongruous with "common sense" for a disabled person to be physically able to perform the duties of a policeman. While "common sense" may be the standard applied to lay persons viewing the situation from a distance, it is certainly not the standard to apply to members of the Board of Public Safety. Had they checked with Punta Gorda police officials, they would have learned, as testified by one of its lieutenants, a former firefighter, than the physical demands of a policeman, as they required, are less demanding that those of a firefighter. The Lieutenant testified that "a woman with leg braces on both legs" successfully completed the same

physical training and defense requirements as plaintiff.

In sum, I hold that the defendants' actions violated the plaintiff's substantive due process rights. Defendants' actions were "arbitrary and capricious" and encompassed "fundamental procedural irregularity." Moreover, the lawless conduct of the defendants in revoking plaintiff's pension, which they baldly and unashamedly conceded was wrong, is only compounded by their continued refusal to afford plaintiff a post-deprivation hearing months after the incident.

### 2. *Procedural Due Process*

To bring a procedural due process claim under § 1983, a claimant must show: (1) that they have a property interest as defined by state law; and (2) that the defendants, acting under the color of state law, deprived them of the property interest without constitutionally sufficient process. *PFZ*, 928 F.2d at 30. There is little question that the plaintiff has a property interest in his pension, *see Waterman*, slip op. at 19, and that the actions were taken under the color of state law. Thus, the key issue is the adequacy of the process.

As noted, plaintiff's central procedural contention is that his pension was revoked without pre-deprivation hearing or notice. For support, the plaintiff points to the U.S. Supreme Court's most recent pronouncement on procedural due process, *Zinermon v. Burch, supra*. In *Zinermon*, the claimant was "voluntarily" admitted to a state mental hospital after he was found wandering along a Florida highway. After his release five months later, he brought a § 1983 action in federal court on the ground that the hospital staff had deprived him of due process of law. The claimant acknowledged that there were post-deprivation state remedies available to him. And he did not directly challenge the adequacy of the state's existing statutory scheme for hospital placement. However, he claimed that hospital staff members "knew or should have known" that he was incapable of voluntary consent and that they failed to

initiate Florida's statutory involuntary placement procedures prior to his admission. 494 U.S. at 121–124, 110 S.Ct. at 981–982.

In a 5–4 decision, the Supreme Court held that the claimant's complaint was sufficient to state a claim under § 1983 for violation of his procedural due process rights. In making this determination, the Supreme Court rejected the trial court's reliance on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), which held that a deprivation of a constitutionally protected property interest resulting from a state actor's "random and unauthorized" conduct does not give rise to a § 1983 procedural due process claim where there are state post-deprivation remedies available. The *Zinermon* Court was particularly swayed by the fact that (1) the deprivation was not "unpredictable"; (2) pre-deprivation process was not "impossible"; and (3) the State had delegated to the hospital staff "the power and authority to effect the very deprivation complained of...." 494 U.S. at 136–138, 110 S.Ct. at 989–990. *Zinermon* also reaffirmed, as plaintiff suggests, the longstanding rule that the due process clause requires a pre-deprivation hearing before the state deprives a person of a property or liberty interest, unless such a hearing is "impossible," or "unduly burdensome" when balanced against the interest at stake. *Id.* at 127–129, 132, 110 S.Ct. at 984–985, 987.

The defendants do not dispute that the plaintiff has a property interest or that there was action under color of state law. Nor do they deny that they violated municipal law. Rather, as indicated *supra* part II.B.1., their chief defense is that there were adequate remedies available to the plaintiff at the state level. According to the defendants, the plaintiff could "arguably" have requested a post-deprivation hearing with the Board of Public Safety,[3] could have sought a writ of mandamus from the state courts directing the Board

---

**3.** There is substantial evidence that plaintiff did in fact seek a post-deprivation hearing from the

Board on several occasions. The Board denied all of these requests.

to comply with the City Code [4], or could have pursued state tort law remedies. Defendants' Pre–Trial Memorandum at 6. Thus, their argument follows that by failing to pursue these alternatives, or demonstrating why they were inadequate, the plaintiff should be barred from bringing his case into federal court.

The defendants' primary case support is *Rumford Pharmacy, supra.* In that case, the plaintiff pharmacy brought a procedural due process suit after the City of East Providence, Rhode Island denied their application to approve a transfer of a local liquor license. In affirming the dismissal of the case, the First Circuit found that the plaintiff had failed to *"allege* that available remedies under Rhode Island law were inadequate to redress any deprivation resulting from appellees' eight-month delay in processing appellant's license-transfer application." 970 F.2d at 999.

The defendants also wave before this court another First Circuit decision addressing a procedural due process claim— *Lowe v. Scott, supra.* In *Lowe,* a doctor brought a procedural due process challenge alleging a deprivation of his property interest in his license to practice medicine. The plaintiff doctor contended that the state medical board's chief administrative officer wilfully miscommunicated to a hospital administrator the board's disposition and order regarding a disciplinary complaint leveled against him, and that this misrepresentation resulted in the loss of certain privileges at that hospital. The First Circuit held that the conduct of the medical board's administrative officer was "random and unauthorized" conduct and hence the doctor's procedural due process challenge under § 1983 should fail "because he did not challenge the adequacy of Rhode Island's post-deprivation tort remedies." 959 F.2d at 343.

Underlying defendants' position is their belief that this action solely encompasses a procedural due process claim. If that were so, then the defendants have presented an interesting and provocative argument. But

plaintiff has alleged, and I have found, a substantive due process violation. This fact alone enables the plaintiff to bring his § 1983 action directly to this Court.

Further, defendants may be reading too much into the *Rumford Pharmacy* and *Lowe* decisions. In *Rumford Pharmacy,* for example, the plaintiff was primarily challenging the operation and pace of an administrative licensing board. From this perspective, the *Rumford Pharmacy* opinion is consistent with the First Circuit's general inclination not to interfere with zoning or administrative licensing decision-making where there are post-deprivation state remedies available. *See Creative Environments, supra* (rejecting procedural and substantive due process claims by developer over city planning board's rejection of subdivision plan); *Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524 (1st Cir.1983) (finding no substantive due process violation after city denied issuance of building permit despite its preliminary approval of development project); *Cloutier v. Town of Epping,* 714 F.2d 1184 (1st Cir. 1983) (revocation of sewer permit for planned mobile home park did not violate developer's equal protection, substantive due process, or procedural due rights); *Chongris v. Board of Appeals of Town of Andover,* 811 F.2d 36 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987) (unsuccessful applicants for building permit and victualler's license did not suffer procedural due process violations); *Amsden, supra* (holding that revocation of land surveyor's license by state board did not result in procedural or substantive due process violations); *PFZ, supra* (rejecting land developer's procedural and substantive due process, and equal protection, challenge to Puerto Rico's refusal to issue building permits); *cf. Roy, supra* (complaint stated valid due process claim where it was alleged that city officials intentionally disregarded judgment of state's highest court to issue pool hall license). As the *Rumford Pharmacy* decision noted, by lacking a declaration that Rhode Island law

---

4. The defendants cite to a 1984 Rhode Island Supreme Court case, *Kritz v. Cianci,* 474 A.2d

1248 (R.I.1984), to champion their mandamus argument.

is inadequate, "the complaint fails to allege an element critically important to a procedural due process claim *resting entirely upon* an eight-month delay in processing an application for a license to which the claimant asserts itself entitled." 970 F.2d at 999 (emphasis added). At a minimum, the facts in *Rumford Pharmacy* are distinguishable from the termination of a government employee's disability *pension* in direct violation of pre-deprivation statutory provisions.

Focusing on *Lowe,* it is worth noting that the First Circuit cautioned that "*Zinermon* requires that courts scrutinize carefully the assertion by state officials that their conduct is 'random and unauthorized' within the meaning of *Parratt* and *Hudson,* where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state post-deprivation remedies." 959 F.2d at 341. Even a cursory examination of the facts in *Lowe* reveals substantial differences from the present action, at least with respect members of the Board. For example, the defendant administrator in *Lowe* was not a member of the licensing board and did not have policy-making authority or broad discretion in performing his duties. Further, there was no evidence that the administrator's communications to the hospital were "predictable" or "foreseeable," or that he possessed any delegated power and authority to "effect" the deprivation. *Id.* at 343–344. Finally, the medical board in *Lowe* had explicit, written procedures on the pre-deprivation process available to the plaintiff doctor to ensure that any disputes over his license would be resolved authoritatively by a committee of the medial board. As the First Circuit concluded: "The critical element of the *Zinermon* Court's analysis—the Court's sense that pre-deprivation safeguards might have had some value in guarding against the injury allegedly suffered by [the claimant]—is not present in this case because the dispute resolution mechanism established ... was as detailed a pre-deprivation safeguard as could have been provided." *Id.* at 344. It would be difficult to conclude the same about the arbitrary procedures employed by the City's Board of Public Safety.

Despite these observations, I need not make a definitive finding on plaintiff's procedural due process claim given my substantive due process holding. For similar reasons, I decline to determine plaintiff's equal protection allegation. It is also unnecessary to determine whether a writ of mandamus or other state remedies were, or are currently, available to the plaintiff.

### III. *Qualified Immunity*

■ The fulcrum of this issue is *Buenrostro v. Collazo,* 973 F.2d 39 (1st Cir. 1992). In that case, the First Circuit thoroughly enunciated the prerequisites for a qualified immunity defense available to state officials exercising discretionary authority. As an initial inquiry, I must "ascertain whether the plaintiff has alleged, with the requisite particularity, that [the defendants] violated some right emanating from federal law." *Id.* at 42. I have found that there was a substantive due process violation in violation of "federal law," all as alleged in the complaint.

Again resting on *Buenrostro,* "[t]he next step is to ascertain whether the right at issue was 'clearly established' at the time of the infringement. If it was, an inquiring court can then presume that the defendant knew, or should have known, that his conduct was beyond the pale." *Id.* (citations omitted).

The defendant Board members contend that it is an absolute defense, divorced of any other considerations, to rest on the advice of counsel. "Advice of counsel," however, would be reduced to an empty shibboleth—a password to immunity—if used knowingly to disregard the law. For reasons already stated, the Board members, must be held accountable. Defendant Haronian especially, the Chairman of the Board, knew or should have known that what they were doing did not comport with state or federal law. The plaintiff's pension was suspended on February 11, 1992, over nine months ago. And in spite of their own acknowledgement that a hearing

was necessary, they refuse to accept such fact.

Certainly the Board is not forever bound by an initial finding of disability. They have the right to seek periodic medical reevaluations and review, so long as they do it in a constitutional manner. Since they have policy-making authority, it is no great task to formulate and establish proper guidelines, so sorely lacking now.

## IV. *Liability*

### A. *Individual Responsibility: Haronian, Martin, Hovey*

Defendants Haronian, Martin, and Hovey, present members of the Board, also were in office on February 11, 1992. They are directly responsible for the suspension of the pension. For reasons stated, I find them liable in their individual capacity.

All other defendants, except the City of Warwick, merely acted in their specific capacity, devoid of any authority to suspend the plaintiff's pension. They did not, nor could they, commit the federal violation— the only one at issue here. Judgment will be entered for each of them.

### B. *The City of Warwick*

■ In order for me to hold the City liable under § 1983, I must find that the "injuries [were] inflicted pursuant to government 'policy or custom.'" *Oklahoma City v. Tuttle*, 471 U.S. 808, 809, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791 (1985); *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 and n. 58, 98 S.Ct. 2018, 2037 and n. 58, 56 L.Ed.2d 611 (1978). The question is whether the actions of Haronian, Martin and Hovey were "the way things are done and have been done" by the Warwick Board of Public Safety. *Kibbe v. City of Springfield*, 777 F.2d 801, 806 (1st Cir. 1985) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985)). As I have already stated, the Board members employed a subjective approach when dealing with pension decisions. Gut reaction has always been characteristic of their behavior as Board members, a practice which has always existed. This is not disputed. This case does not fall within the constrictions of *Tuttle*. 471 U.S. at 821, 105 S.Ct. at 2435; ("[I]solated instances of police misbehavior are inadequate to prove the knowledge and acquiescence by a city policymaker in that manner of conduct." *Kibbe*, 777 F.2d at 806 (quoting *Grandstaff, supra*, at 171)). Furthermore, the constitutional violation was approved, indeed deliberately chosen, "by the official or officials [Haronian, Martin and Hovey] responsible for establishing final policy with respect to the subject matter [pensions] in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–484, 106 S.Ct. 1292, 1344, 89 L.Ed.2d 452 (1986). I have already said, and the defendants do not dispute, they are the policymaking pension authorities. Thus, the City of Warwick must be held liable.

I conclude judgment must be entered for the plaintiff against defendants Haronian, Martin and Hovey, and the City of Warwick.

## V. *Damages*

### A. *Pension*

■ Based on the foregoing findings and legal conclusions, there can be no dispute that the plaintiff is entitled to his pension as of the date of revocation, February 11, 1992, and the reinstatement of his entitlement to future pensions. As to the latter, I reiterate that the plaintiff's pension is not etched in granite. The Board has the right to seek medical review and reevaluation of pensioners' disabilities so long as they do it in a constitutionally acceptable way.

The plaintiff also seeks compensatory and punitive damages. I will address these in turn.

### B. *Compensatory Damages*

■ First, he claims lost income. This needs little discussion. This claim is premised on his contention that had his pension not been revoked, he would have continued his employment as a Punta Gorda police officer. This, I find, is sheer nonsense. He voluntarily resigned from the Punta Gorda police force; his employer did not seek his resignation nor did the defendants require or ask him to do so. In his letter of

resignation dated February 17, 1992, the plaintiff claimed the resignation was being coerced "as a result of political pressure ..." and defendants "ploy to undermine" his brother's political campaign. I am not impressed. I conclude he resigned thinking it might cause the Board to change its mind, an assumption he had no right to make.

■ Finally, the plaintiff seeks compensation for emotional harm resulting in alleged physical symptoms of abdominal and bowel pain as well as chest pain. Under Rhode Island law, negligent infliction of mental distress is recognized as an independent cause of action; recovery, therefore, does not require a showing of physical impact. However, not every psychic injury negligently inflicted is entitled to the protection of the law. No recovery can be had for mental distress that has not manifested itself in physical symptoms. *See D'Ambra v. United States*, 354 F.Supp. 810 (D.R.I. 1973), *aff'd*, 481 F.2d 14 (1st Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973); *Reilly v. United States*, 547 A.2d 894 (R.I.1988) (plaintiff must suffer physical symptomatology to recover damages for negligent infliction of emotional distress under Rhode Island law). In contrast, federal law does not require physical symptomatology. Even though a plaintiff suffers no physical injuries, his emotional harm may be compensable if he has suffered a "medically cognizable psychological distress." *Perez v. Rodriquez Bou*, 575 F.2d 21, 25 (1st Cir.1978).

In this case, the plaintiff suffered emotional distress causally related to the suspension of his pension which, in turn, aggravated a pre-existing physical condition and his present irritable bowel. So, under both Rhode Island and federal law, the plaintiff has met the prerequisite for recovery.

The plaintiff's expert on this issue was a distinguished gastroenterologist and a full professor at Brown University Medical School. He found that the plaintiff was suffering from an irritable bowel syndrome, and opined that such a symptom can be causally related to psychological stress. He stated that if the history relayed to him by the plaintiff was reliable, he would conclude that in this case there was a "temporal relationship" and "perhaps" a causal relationship between the plaintiff's symptoms and the suspension of the pension; that is, the ailment being experienced by the plaintiff "developed at the time [he was] undergoing this psychic stress." The doctor qualified his opinion by also saying that though nervousness and tension can cause irritable bowel syndrome, he cannot definitively say it was the cause of the plaintiff's condition. Still, in his opinion, it did in this case. He concluded by saying the plaintiff could not be a firefighter in his present state.

The medical testimony, though not unequivocally favorable, established the necessary nexus to warrant compensatory damages. However, it should also be noted that the plaintiff was involved in divorce proceedings, had previously been treated for ulcers, and may have aggravated his problem with excessive self-administered medication and smoking.

Vocalizing that damages must be proven as any other fact and that resort to conjecture is impermissible, gives me no guidance to the discretionary dimensions inherent in making an assessment. Here we have a common ailment that does not, as the doctor testified, incapacitate most people from working; a lack of effort on the part of the plaintiff to find employment to accommodate his condition; and an ephemeral illness, which means, as I understood the doctor, that when the stress is resolved the symptoms should disappear. In short, the plaintiff has merely had a trying experience since February 1992, a span of approximately nine months. I conclude compensatory damages to be in the amount of ten thousand ($10,000.00) dollars.

## C. *Punitive Damages*

■ Punitive damages in a § 1983 action may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Davet v. Mac-*

*carone,* 973 F.2d 22, 27 (1st Cir.1992) (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). The First Circuit has further refined this standard by holding that punitive damages are limited to instances where a defendant's conduct is the type that demands deterrence and punishment in excess of compensatory damages. 973 F.2d at 27. The key element in this case, that generates an exemplary award, is the defendants' (Haronian, Martin and Hovey) reckless and callous indifference to the plaintiff's federally protected right. It is my opinion that their conduct supports a punitive award. In the exercise of my discretion, I assess one thousand ($1,000.00) dollars as against each defendant for a total of three thousand ($3,000.00) dollars.

SO ORDERED.