*1118
 
 OPINION
 

 Per Curiam:
 

 The Southern Nevada Disciplinary Board of the State Bar of Nevada (“the Board”) charged appellant Arthur H. Singer (“Singer”) with four violations of SCR 158(1). SCR 158(1) provides:
 

 1. A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, posses-sory, security or other pecuniary interest adverse to a client unless:
 

 (a) The transaction and terms of which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in the manner which can be reasonably understood by the client;
 

 (b) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
 

 (c) The client consents in writing.
 

 The four violations arose from transactions between Singer and his clients, three violations of which are relevant to this appeal. These violations charged against Singer were: (1) using undue influence to cause his client to finance Singer’s home; (2) causing his client to loan Singer $20,000.00; and (3) proposing an equity swap with his client’s daughters.
 

 Following a hearing, the Board recommended that Singer’s license to practice law be suspended for not less than six months and one day. The panel further recommended that the suspension be stayed provided Singer perform the following conditions:
 

 a. That [Singer] take and pass the Multistate Professional Responsibility Examination at the next time it is administrated and provide evidence of said passage to the State Bar; [and]
 

 b. That he make the Creasy Trust whole, as early as practicable, but no case [sic] later than 120 days, by
 

 (1) repaying to the Creasy Trust the entire $205,000.00 principal loaned to him and/or the Singer-Guilloud Trust for purchase of Singer’s home/office, including by refinancing the property if necessary;
 

 (2) paying the Creasy Trust the difference between the amount of interest Singer (whether he personally, or through his professional corporation, his wife, and/or the Singer Trust) actually paid on the $205,000.00 from February 10, 1989, to the date repaid in full, and the amount of interest that would have been charged to Singer and/or the Singer-
 
 *1119
 
 Guilloud Trust on a residential real estate loan entered into February 10, 1989, for that same property, by the two largest banks in the State of Nevada; [and]
 

 (3) pay[ing] the costs to Creasy’s heirs and/or the Creasy Trust, of transfer of the $205,000.00 note and/or its proceeds, including interest as set forth above, to the Creasy Trust, including but not limited to the costs of probate of Mrs. Creasy’s will.
 

 Once Singer fulfilled these conditions, he would receive a public reprimand. This appeal ensued.
 

 An understanding of the nature of Singer’s relationship with his client, Mrs. Grace Creasy (“Creasy”), and the events surrounding their acquaintance is essential to appreciate the essence of Singer’s misfeasance. Singer met Creasy when he hired her to work as his housekeeper. At the time, she remained despondent over the loss of her husband who had died two years earlier.
 

 Shortly after beginning work, Creasy’s leg required amputation due to medical negligence. Singer advised Creasy regarding a medical malpractice action and referred her case to another law firm, receiving a referral fee of approximately $73,000.00 after the case settled.
 

 Thereafter, Singer became increasingly intertwined in Creasy’s affairs. Singer deposited the settlement proceeds of $321,774.37 into a trust account from which Creasy could not withdraw funds without his approval. He served as Creasy’s attorney, accountant, and personal advisor. He prepared a will, which named him executor, and a revocable living trust (“the Creasy Trust”), which named Singer trustee.
 

 The purpose of the trust was to provide Creasy with payments of the income of the trust and as much of the principal as she requested during her life. Following her death, the trust was to distribute to her daughters as much of the net income and principal of the Trust as the Trustee, in the Trustee’s discretion, deemed necessary. This discretion was to be exercised mindful of Creasy’s desire to provide for the welfare of her adult children, grandchildren, and great-grandchildren. Creasy’s adult daughters were designated as co-trustee’s to succeed Singer.
 

 As trustee, Singer invested the bulk of the settlement proceeds in certificates of deposit. When Creasy complained to Singer about the falling interest rates on the certificates of deposit, he suggested that Creasy reinvest the settlement proceeds, now the property of the trust, by financing the purchase of his new home and office building. Singer then drafted a letter that implied Creasy had made the offer to finance his venture. This “disclosure” letter also did the following: (1) outlined the terms of the transaction; (2) recited the text of SCR 158(1); and (3) informed
 
 *1120
 
 Creasy she had the right “but not the obligation” to consult with independent counsel. Creasy executed this agreement. However, she modified it to reduce the loan amount from $230,000.00 to $205,000.00. Notwithstanding Singer’s apparent disclosure, the matters of which Singer did not inform Creasy are of greater import than those he did.
 

 Singer did not advise Creasy of the relative risks and merits of this transaction versus the risks of other investments that were available to her. In addition, Singer did not advise her that as long as he continued to make interest-only payments on the 30-year note, Creasy, the Creasy Trust, her adult children, and her grandchildren would
 
 not
 
 have access to the funds in the event of an unanticipated need for cash. This arrangement was contrary to Creasy’s desires expressed in the trust documents. Singer also did not advise Creasy of the benefits to himself of the transaction; i.e., the interest-only payments and the benefit of not being compelled to seek financing from a bank or a mortgage company.
 

 Singer later borrowed an additional $20,000.00 from the Creasy Trust in return for four unsecured promissory notes of $5,000.00 each. Singer’s disclosure letter for this loan again cited SCR 158 and stated that Creasy had the right “but no obligation” to seek independent counsel. The letter did not point out that the notes were unsecured and made no mention of the risks inherent in such a loan. Not surprisingly, Creasy did not seek the advice of independent counsel for either the home/office investment or the $20,000.00 loan. She agreed to both within days of their proposal.
 

 The day after Creasy died, Singer proposed an equity swap to Creasy’s daughters of their mother’s condominium for a house that Singer owned. Singer prepared a similarly inadequate disclosure letter which neither explained the risks and disadvantages of switching the equity nor explained the benefits of the transaction to Singer. The daughters testified that they did not understand the deal and sought independent counsel. After independent counsel advised against the deal, the daughters rejected the equity swap.
 

 There is a great temptation for an attorney to temper his or her loyalty to a client where the attorney’s own financial interests are involved. Hence, all personal financial interests — in particular, business transactions between attorney and client that benefit the attorney, as here — are closely scrutinized for any unfairness on the part of the attorney. In any transaction in which an attorney is charged with obtaining a business advantage from a client, there is a presumption of impropriety which may be overcome only be clear and satisfactory evidence that the transaction was fundamentally fair, free of professional overreaching, and fully dis
 
 *1121
 
 closed.
 
 See
 
 Williams v. Waldman, 108 Nev. 466, 472, 836 P.2d 614, 618 (1992); Davidson v. Streeter, 68 Nev. 427, 440, 234 P.2d 793, 799 (1951). The attorney must ensure that the client has independent advice in the matter or is given the same information as would have been given by a disinterested attorney.
 
 Williams,
 
 108 Nev. at 472-73, 836 P.2d at 619.
 

 Singer clearly placed himself in a position wherein the exercise of his professional judgment on behalf of his clients could be affected by his own financial interests. In light of the strong presumption of impropriety attached to business transactions such as the loans and financing agreements into which Singer entered with his clients, we cannot conclude that “technical compliance” with SCR 158 is sufficient for Singer to avoid reprimand. Singer’s actions thwart both the spirit and the purpose of SCR 158.
 

 Accordingly, we affirm the Board’s decision that Singer violated SCR 158 by failing to provide his clients with sufficient information to enable them to make informed decisions relative to the transactions involved, and as to whether to consult with independent counsel. We hereby publicly reprimand Singer for his conduct. We also order that Singer fulfill the conditions recommended by the panel within the allotted time from the date of this opinion. Should Singer fail to fulfill the conditions with the time allotted, he will be suspended from the practice of law for a period of six months and one day.