Mitchell MASS, Plaintiff,

v.

Bruce McCLENAHAN, Imperial Marketing, Inc., Honeywell & Roberts, Inc., Lead Marketing, Inc., Enigmatic Marketing, Inc., John Doe and Jack Doe, Defendants.

No. 93 Civ. 3290 (JSM).

United States District Court, S.D. New York.

May 8, 1995.

Richard D. Emery, Lankenau, Kovner & Bickford, New York City, for Mitchell Mass.

Howard B. Levi, Levi & Lubarsky, New York City, for Bruce McClenahan, Imperial Marketing, Inc., Honeywell & Roberts, Inc., Lead Marketing Group Inc., Enigmatic Marketing, Inc.

## MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

Mitchell Mass, a New York attorney, was retained by defendant Imperial Marketing, Inc. ("Imperial") in February of 1992. Between that time and March of 1993, he advised Imperial and several affiliated entities, the other corporate defendants named in this action, on a range of corporate and litigation matters.

In the fall of 1992, Bruce McClenahan, Imperial's sole shareholder, allegedly began to encourage Mass to move to Las Vegas, where Imperial and McClenahan's other businesses were headquartered, and to accept employment as an executive of Imperial. These overtures led to negotiations and even-

tually to a written contract between Mass and Imperial (the "employment contract" or "employment agreement"), executed in January of 1993, pursuant to which Mass was hired to serve as Imperial's president and CEO for a minimum of three years, *see* Celli Aff. Ex. B, Sub–Ex. 1; Levi Aff. Ex. D.

On or about January 23, 1993, McClenahan allegedly made a telephone call to Mass in which he terminated the employment agreement between Mass and Imperial. Mass claims that, during the telephone call, McClenahan told Mass that he had shown the employment contract to "advisors," who had informed McClenahan that hiring a "New York Jew" would be disastrous for Imperial and McClenahan. According to Mass, McClenahan explained that his "advisors' " concerns were the reason for the termination of the employment agreement. Celli Aff. Ex. D., at 294–97.

Thereafter, Mass continued to serve as Imperial's attorney. However, on or about March 12, 1993, McClenahan allegedly made another telephone call in which he terminated Mass as an attorney for the corporation. According to Mass, McClenahan told him that McClenahan's "advisors" had suggested that Imperial should not continue to retain a "New York Jew" as its attorney; once again, McClenahan allegedly said that the concerns of his "advisors" were the reason for Mass' termination as Imperial's attorney. *Id.* at 328, 517–19.

Mass then filed the present lawsuit, in which he has brought a claim under 42 U.S.C. § 1985(3) against all defendants; a claim against Imperial and McClenahan under 42 U.S.C. § 1981; and claims against McClenahan and Imperial for breaching the employment agreement and for filing a frivolous lawsuit in federal district court in Nevada. Now before the court are related motions by the defendants for full or partial

summary judgment in their favor.[1] For the reasons discussed below, defendants' motion for partial summary judgment on plaintiff's § 1981 claim is denied; summary judgment is granted in favor of all defendants on plaintiff's § 1985(3) claim; summary judgment dismissing plaintiff's contract claim against Imperial is denied; and summary judgment dismissing the contract claim against McClenahan is granted.

## I. *The § 1981 Claim*

■ Defendants ask the court to grant summary judgment on plaintiff's § 1981 claim "to the extent [this claim] seek[s] to impose liability and recoup damages arising out of plaintiff's termination as defendants' attorney." Defs.' Br. at 3–4. Defendants argue that § 1981 either does not, or constitutionally cannot, reach the attorney-client relationship between Mass and Imperial.[2]

■ Section 1981 provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." The statute undoubtedly reaches the attorney-client relationship between Imperial and Mass. By its terms, the statute is applicable: Mass is a "person within the jurisdiction of the United States," and the relationship between him and his fee-paying client was a contractual one. Defendants suggest that the statute was not intended to reach an attorney's contract to perform legal services for his client, but Congress nowhere indicated such an intent. To the contrary, when Congress chose to protect the right to make and enforce contracts, it meant to provide a sweeping remedy against racial discrimination. *See Runyon v. McCrary*, 427 U.S. 160, 170, 96 S.Ct. 2586, 2594, 49 L.Ed.2d 415 (1976); *see also Jones v. Alfred H. Mayer Co.*, 392 U.S.

---

1. With respect to all of the issues raised by the defendants except those considered in III. A., below, defendants have moved in the alternative for judgment on the pleadings. Since the court has considered materials outside the pleadings in reaching its decision, defendants' motion is treated as one for summary judgment rather than for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c).

2. Although defendants raise an intriguing question, it is of limited relevance given the facts of this case. Plaintiff contends that he was terminated not only as Imperial's attorney, but also as its CEO and president. Thus even if defendants prevailed on the issue they raise, a trial on plaintiff's § 1981 claim would still be necessary and would involve almost exactly the same proof.

409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968).[3]

■ Defendants note that there is a strong public policy supporting the right of a client to discharge an attorney at any time, despite contractual provisions to the contrary. *See, e.g., In re Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (Ct. App.1994). From this they argue that, because an attorney has no contractual right to continued employment by his client, plaintiff has not stated a claim under § 1981. However, even if one were to consider a contract between an attorney and client to be an agreement that is terminable at will by the client, such a contract could not be terminated for a discriminatory reason. *See Campbell v. AT & T Communications*, 1994 WL 380620, at *3 (N.D.Ill. July 18, 1994) ("There is no 'at-will' defense to a federal discrimination complaint."); *see also Baker v. Am. Juice, Inc.*, 870 F.Supp. 878, 883 (N.D.Ind. 1994) (§ 1981 applicable when at-will employee alleged that he had been discharged on the basis of his race). Where there is clear evidence that the contract was terminated for a prohibited reason, there is no justification for applying a different rule simply because the contract is one between a lawyer and client.

■ While the worthwhile goal of protecting a client's right to discharge a lawyer at any time may make it appropriate to impose a higher standard of proof of discriminatory intent when a lawyer brings a claim of discrimination, in the present case there is direct evidence that plaintiff was discharged because he was "a New York Jew." If this is in fact what happened, the public policy embodied in § 1981 clearly requires that plaintiff be provided with a remedy. This coun-try's strong commitment to the proposition that there should be no discrimination on the basis of race, religion or national origin need not founder on the fear that somehow the enforcement of this policy will destroy the attorney-client relationship. It is difficult to believe that lawyers will often bring claims of discrimination against their former client. In the rare case where the issue is raised, the courts can be trusted to scrutinize such claims with care and to fashion appropriate relief.

■ Nor would application of § 1981 to the attorney-client relationship between Mass and Imperial impinge on Imperial's First Amendment freedom of association. The First Amendment protects relationships which involve "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs, but also distinctively personal aspects of one's life." *Roberts v. United States Jaycees*, 468 U.S. 609, 617, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984).[4] Among the reasons that such relationships warrant constitutional protection, the *Roberts* Court discussed two in particular: first, such relationships play a critical role in "cultivating and transmitting shared ideals and beliefs," and thus "foster diversity and act as critical buffers between the individual and the power of the State," 468 U.S. at 619, 104 S.Ct. at 3250; and second, such ties are a source of considerable "emotional enrichment" to the individuals involved, thereby enhancing "the ability independently to define one's identity that is central to any concept of liberty," *id.*

The attorney-client bond between Mass and Imperial possesses some of the features that the *Roberts* Court identified as ear-

---

**3.** As emphasized by Congress when it amended the statute in 1991: "Section 1981 is of particular importance [because] ... [it] is the only federal law banning race discrimination in all contracts. It has been a critically important tool used to strike down racially discriminatory practices in a broad variety of contexts." H.R.Rep. No. 102–40(II), 102d Congress, 1st Sess. (1991), U.S.Code Cong. & Admin.News 1991 p. 694, available in Westlaw, 1991 WL 87020, at *68.

**4.** In addition to the right of "personal" or "private" association, described in the text, the Su-preme Court has "recognized a right to associate for the purpose of engaging in activity protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249. The present case does not involve this kind of "expressive" association. An attorney and client often collaborate in order to advance shared political or social goals, *see, e.g., NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), but Imperial and Mass did not.

marks of a constitutionally protected relationship. Imperial's decision to retain Mass as its attorney was undoubtedly a "highly selective" one, *see* 468 U.S. at 620, 104 S.Ct. at 3250, depending heavily on Mass' ability to build a rapport with McClenahan and Imperial's senior executives. Moreover, both the attorney-client privilege and Mass' ethical obligations as a lawyer guaranteed the exclusion of outsiders from "critical aspects of the relationship." *Id.*

However, anything more than a superficial examination of the attorney-client relationship between Imperial and Mass reveals that it was not the kind of close personal bond with which the First Amendment is concerned. Imperial hired Mass in order to protect and advance its business interests. It relied on Mass' professional expertise in much the same way as it might rely on the expertise of an accountant, consultant or investment banker. The various Imperial executives who interacted with Mass did not draw any "emotional enrichment" from the relationship; they did not "cultivate shared ideals and beliefs" together with Mass; their sense of self was not positively reinforced through their association with Mass. Imperial's interest in associating, or not associating, with Mass thus does not merit constitutional protection.

Since defendants' statutory and constitutional arguments are unavailing, defendants' motion for partial summary judgment on plaintiff's § 1981 claim is denied.

## II. *The § 1985(3) Claim*

Defendants also seek summary judgment on plaintiff's § 1985(3) claim, arguing that plaintiff has produced no evidence of a conspiracy actionable under the statute.

■ To establish a claim under § 1985(3), plaintiff must show that the defendants (1) engaged in a conspiracy; (2) acted for the purpose of depriving a person of equal protection of the laws or equal privileges and immunities; and (3) acted in furtherance of the conspiracy; (4) whereby plaintiff was injured with respect to his person or property, or was deprived of a right or privilege of a citizen of the United States. *See Griffin v.*

*Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Wahad v. FBI,* 813 F.Supp. 224, 231 (S.D.N.Y. 1993). In addition, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798.

■ Plaintiff must do more than make vague, general or conclusory accusations in order to establish the existence of a conspiracy actionable under § 1985(3). *Williams v. Reilly,* 743 F.Supp. 168, 173–74 (S.D.N.Y. 1990). Absent specific factual allegations as to the participation of a particular defendant in the conspiracy, plaintiff's § 1985(3) claim cannot survive a motion for summary judgment by that defendant. *See McPartland v. American Broadcasting Companies, Inc.,* 623 F.Supp. 1334, 1341 (S.D.N.Y.1985). With respect to defendants Enigmatic Marketing, Lead Marketing and Honeywell & Roberts, plaintiff has claimed only that, at some point between February 1992 and March 1993, he performed legal services for them. The fact that he did so, and the fact that McClenahan owns part or all of each of these entities, would not justify any inference of participation in a conspiracy to deprive Mass of rights protected by § 1981. Accordingly, summary judgment in favor of these defendants is granted.

■ Plaintiff has described in detail the roles played by Imperial and McClenahan in the deprivation of plaintiff's rights under § 1981. However, there is no "conspiracy" within the meaning of § 1985(3) when the challenged conduct is essentially a single business decision made by a single corporate entity, acting through its agents. *See Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 70–72 (2d Cir.1976), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). In the present case, plaintiff claims that McClenahan "acted on behalf of Imperial" when he terminated Mass as Imperial's president and CEO. Compl. ¶ 23. Since McClenahan was Imperial's sole shareholder and was the controlling voice in virtually all important decisions regarding corporate personnel, it is also logical to con-

clude that McClenahan was acting "on behalf of Imperial" when he terminated Mass as Imperial's attorney. Moreover, plaintiff has made no allegations which might show that McClenahan was pursuing an interest separate from that of Imperial when he dismissed Mass as the corporation's president, CEO and lawyer. *See Girard,* 530 F.2d at 71–72. Thus plaintiff's § 1985(3) claim against Imperial and McClenahan does not satisfy the statute's "conspiracy" requirement, and summary judgment in favor of these defendants on this claim is granted.

### III. *The Breach of Contract Claim*

Plaintiff has named both Imperial and McClenahan as defendants on his claim for breach of the employment contract. Both defendants seek summary judgment on the ground that the agreement is void and unenforceable. McClenahan also argues that, even if the agreement is enforceable, he cannot be held liable for Imperial's breach of the agreement.

### A. *The Enforceability of the Contract*

■ The defendants contend that the employment contract into which Mass and Imperial entered is unenforceable because plaintiff did not observe the requirements of the Nevada Supreme Court's Rule of Professional Conduct 158(1) when negotiating the contract.[5]

■ The court agrees that Nevada law controls on this issue. The validity of a contract must be determined according to the law of the state having the greatest interest in its formation. *See Stephens v. American Home Assur. Co.,* 811 F.Supp. 937, 946 (S.D.N.Y.1993). Here, the contract between Mass and Imperial was negotiated in large part in Nevada and was made there; and, as discussed below, Nevada has a significant interest in protecting Imperial, a corporation organized under its laws and doing business within the state, from the possible "overreaching" of Mass, Imperial's attorney. New York's interests in the formation of the contract are comparatively minor.

■ However, the court rejects defendants' contention that a contract that violates the terms of SCR 158(1) is *per se* unenforceable.[6] No Nevada court has held that a violation of the rule automatically voids the resulting contract. Indeed, when applying SCR 158(a) to an attorney for disciplinary purposes, Nevada's highest court emphasized the need for compliance with the "spirit and purpose" of the rule rather than with the rule's exact requirements. *In re Singer,* 109 Nev. 1117, 865 P.2d 315, 317 (1993). There is no reason to believe that Nevada's courts would take a different approach when determining whether to enforce a contract between a lawyer and his client.

■ Although defendants' reliance on the precise terms of SCR 158(a) is unwarranted, it is clear that the contract at issue would be unenforceable if it were found that Mass had exercised undue influence over Imperial when the contract was executed. Nevada's courts have held that, when an attorney deals with his client for the former's benefit, a presumption arises that the transaction between them is improper. *See In re Singer,* 109 Nev. 1117, 865 P.2d 315, 317 (1993); *Davidson v. Streeter,* 68 Nev. 427, 234 P.2d 793, 799 (1951). To overcome that presumption, "an attorney must demonstrate by ... clear and satisfactory evidence that

---

**5.** Defendants made precisely the same argument in support of an unsuccessful summary judgment motion in the parties' pending suit in the District of Nevada. However, defendants are not collaterally estopped from pressing the same point in this court: since the Nevada district court relied on the existence of factual disputes in denying the defendants' motion, the court's decision was not a "final" one for purposes of collateral estoppel. *Kay–R Elec. Corp. v. Stone & Webster Constr. Co.,* 23 F.3d 55, 59 (2d Cir.1994).

**6.** SCR 158(1) provides:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to the client unless:

(a) The transaction and the terms of which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in the manner which can reasonably be understood by the client;

(b) The client is given a reasonable opportunity to seek advice of independent counsel in the transaction; and

(c) The client consents in writing.

the transaction was fundamentally fair and free of professional overreaching." *Williams v. Waldman,* 108 Nev. 466, 836 P.2d 614, 618 (1992). As explained by the Williams court, public policy requires the lawyer to show that he (1) made sure that his client was fully informed as to the nature and effect of the proposed transaction, and (2) saw to it that his client either received independent advice in the matter, or else received from the attorney the same advice that the attorney would have given had the transaction between his client and a stranger. *Id.* 836 P.2d at 618–19.

■ There is, at the very least, a genuine question of fact as to whether Mass has met these requirements. Mass negotiated for his contract over a period of several weeks with McClenahan, an experienced entrepreneur who routinely decided who to hire as Imperial executives, how much to pay them, when to fire them, and whether to make them sign noncompetition agreements. Celli Aff. Ex. D, at 168–70; *id.* Ex. E, at 161–63; *id.* Ex. F at 20–22, 30–32, 34–35; *id.* Ex. J, at 16; *id.* Ex. K, at 83–84; *id.* Ex. L, at 68–72. Under these circumstances, it is difficult to believe that McClenahan did not understand the "nature and effect" of Mass' employment agreement. Certainly McClenahan did not lack sources of "independent advice": Mass testified at his deposition that, a month before the agreement was signed, McClenahan told him that he planned to "have the agreement reviewed by his professionals, by his lawyers, by other people." Levi Aff. Ex. C, at 139.

Since the parties' submissions would allow a reasonable factfinder to conclude that the employment contract was not the product of "overreaching" on Mass' part, defendants' motion for summary judgment on that ground is denied.

7. Under an ordinary choice-of-law analysis, it appears that Nevada, rather than New York, law would determine whether McClenahan was liable on plaintiff's breach of contract claim. However, the parties to a litigation may by their conduct consent to the law to be applied. *See Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131, 137 (2d Cir.1991); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52

**B.  *McClenahan's Liability on the Contract Claim***

■ However, the court can find no reason to hold McClenahan liable for any breach of the employment contract by Imperial. Mass contends that McClenahan should be held liable for Imperial's breach on a veil-piercing theory; but "it is well settled that New York courts are reluctant to disregard the corporate entity." *Wm. Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600 (2d Cir.1989).[7] In general, to justify piercing the corporate veil, a plaintiff must show that "(1) the owner[ ] exercised complete domination of the corporation in respect to the transaction attacked; and that (2) such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. Dep't of Taxation & Finance,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 810–11, 623 N.E.2d 1157 (Ct.App.1993); *cf. Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) (New York law allows veil to be pierced either when there is fraud, or when corporation has been used as alter ego). However, "[b]ecause a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the [veil-piercing] power may be exercised." *Morris,* 603 N.Y.S.2d at 810, 623 N.E.2d at 1160.

■ Plaintiff has not satisfied the two-prong test set forth in *Morris.* First, it is not clear that, with respect to the employment contract, McClenahan "dominated" Imperial so "completely" that it was reduced to a mere instrumentality of his. *See Lowendahl v. Baltimore & Ohio R. Co.,* 247 A.D. 144, 287 N.Y.S. 62, 75 (App.Div.), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (Ct.App.1936). It is true that McClenahan himself negotiated the

(2d Cir.1984). In the present case, the parties have relied almost exclusively on New York law in their briefs when arguing over McClenahan's liability under the contract. *See Passalacqua,* 933 F.2d at 137; *Heller,* 730 F.2d at 50. Nevada's law is, in any event, similar to that of New York on these issues. Accordingly, the court will apply New York law.

234

terms of the contract. But Imperial, not McClenahan, would have benefitted from the services Mass was to render under the agreement; and Imperial, not McClenahan, was to pay Mass' salary. Mass claims that McClenahan agreed to guarantee Imperial's obligations under the contract; but there is no evidence that Imperial either would not or could not itself have paid Mass.

However, even assuming that plaintiff did "completely dominate" Imperial with respect to the making and breach of Mass' employment contract, Mass has not satisfied the second prong of the *Morris* test: he has produced no evidence which might show that McClenahan "misused the corporate form for his personal ends so as to commit a wrong or injustice on [Mass]." 603 N.Y.S.2d at 811, 623 N.E.2d at 1161. There is no indication that McClenahan sought to further his personal interests, rather than those of Imperial, when he negotiated and later terminated the employment contract. Nor has Mass shown that, by choosing to use the corporate form instead of doing business in his personal capacity, McClenahan somehow tricked or took advantage of Mass. *See Guptill Holding Co. v. State,* 33 A.D.2d 362, 307 N.Y.S.2d 970, 973 (1970), *aff'd,* 31 N.Y.2d 897, 340 N.Y.S.2d 638, 292 N.E.2d 782 (Ct.App.1972); 18 Am.Jur.2d *Corporations* § 51. Thus, under the circumstances of the present case, piercing the corporate veil would be unjustified.

<span style="background:black">    </span> Plaintiff argues that even if the present case does not lend itself to piercing the corporate veil, McClenahan is nonetheless liable for any breach of the employment agreement by Imperial. Mass claims that McClenahan orally agreed to guarantee Imperial's obligations under the contract, and adds that he later provided McClenahan with a written guarantee for McClenahan's signature. However, under New York law, a promise to answer for the obligation of another must be in writing and signed by the party to be charged in order to be enforceable. G.O.L. § 5–701(a)(2). Thus McClenahan's oral guarantee is unenforceable; and since McClenahan never signed the written guarantee submitted to him by Mass, it is unenforceable as well.

Accordingly, McClenahan's motion for summary judgment dismissing plaintiff's breach of contract claim against him is granted.

**SO ORDERED.**