**Victor DAY, Plaintiff,**

**v.**

**BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA and Pill Soon Song, Defendants.**

No. 4:CV94–3193.

United States District Court, D. Nebraska.

Oct. 24, 1995.

---

James C. Zalewski, Demars, Gordon Law Firm, Lincoln, NE, for Victor Day.

David R. Buntain, Cline, Williams Law Firm, Lincoln, NE, John C. Wiltse, University of Nebraska, Lincoln, NE, for Board of Regents, of University of Nebraska, Pill Soon Song.

## MEMORANDUM AND ORDER

PIESTER, United States Magistrate Judge.

Pending before the court is the defendants' motion for summary judgment. (Filing 39). For the reasons set forth below, I shall grant the motion with respect to plaintiff's constitutional and age discrimination claims and dismiss his state based contract claim for want of jurisdiction.[1]

## BACKGROUND

Plaintiff, Dr. Victor Day, is employed as a professor in the Chemistry Department at the University of Nebraska–Lincoln and is a resident of Nebraska. (Amended Complaint at ¶ 4; Answer to Amended Complaint at ¶ 1). The defendant Board of Regents of the University of Nebraska (Regents) is the governing body of the University of Nebraska–Lincoln (UNL) and defendant Dr. Pill Soon Song has been the chairperson of the UNL Chemistry Department since 1987. The defendants are also residents of Nebraska. (Amended Complaint at ¶ 4–5; Answer to Amended Complaint at ¶ 1).

UNL hired Dr. Day as a chemistry professor in 1972 and he has been a tenured professor since 1979. (Day Depo. 3:10–12; Defendant's Brief at 3). He became a full professor in August 1985. (Defendant's Brief at 3; Plaintiff's Brief at 2). Day is a member of the inorganic chemistry section of the department and specializes in crystallography—the study of crystal structures using diffraction equipment. (Day Depo. 46:8–47:12). Since 1984 Dr. Day has not taught any courses other than freshman chemistry and in the same year his teaching load was raised from nine to twelve credit hours per semester. (Day Depo. 137:4–14).

Prior to 1980 Dr. Day conducted his research in Hamilton Hall, a building on UNL's city campus which houses the Chemistry Department. Dr. Day had his own assigned laboratory space where he conducted research and worked with graduate students. In 1980 Dr. Day decided to remove his research activities from campus and now conducts his research in a laboratory in his home. Dr. Day's home is located outside the Lincoln city limits and is five miles from the UNL campus. (Day Depo. 2:19–3:5). Dr. Day continues to have an assigned laboratory space of approximately 600 square feet in Hamilton Hall, however, the equipment has not been functional for six or seven years. (Day Depo. 44:16–45:19; 50:15–16). Day asserts that the laboratory in his home is more complete and has better equipment than his office at UNL. (Day Affidavit at ¶ 8–9). Dr. Day admits that there is probably "no other situation like this in the country," where a faculty member's laboratory is physically located somewhere other than in the chemistry department. (Day Depo. 121:8–13).

Dr. Day's laboratory space at his home is operated through a corporation named Crystalytics. The corporation was formed in 1979 by Dr. Day and his wife. Dr. Day owns 49% of Crystalytics while his wife owns the remaining 51% and is the president of the organization. The company analyzes crystal structures on a contract basis for other private companies. (Day Depo. 45:20–50:14).

1. The parties consented to have me preside at the trial and enter judgment pursuant to 28 U.S.C. § 636(c). (*See* filing 12.)

During his early years as a UNL faculty member, Dr. Day worked with interested undergraduate and graduate students before he moved his research to his home. After he moved his laboratory to his home, four students, at most, have researched with him. (Day Depo. 50:1–51:14, 59:17–22; Day Affidavit at ¶ 3). UNL has not assisted Day in obtaining graduate students or assigned him any in the past. (Plaintiff's Index of Evidence Exhibit 1—Song Depo. 181:3–193:16).

Each year a five-person Chemistry Department Executive Committee and the Department Chair, Dr. Song, evaluate the performance of faculty members during the preceding year. The results of the merit evaluation, market conditions, and increases in the cost-of-living are used to determine individual faculty member salaries. (Song Affidavit ¶ 3 and 7). Individual faculty members are evaluated with the use of a grid referred to as a "merit matrix." The matrix system allows the Committee to assign faculty scores in several subcategories in order to measure an individual's performance in research, teaching, and service at UNL. The Department adopted the merit matrix system in the 1970's and it has been used to make salary determinations since that time. (Song Affidavit at ¶ 4–5).

Merit evaluation categories are given unequal weight by the Department. From 1987 to 1994 research accounted for 60%, teaching 30%, and service 10% of a faculty member's score. In 1995 research accounted for 55%, teaching 35%, and service 10% of an individual's score. (Day Depo. 35:1–40:11; Song Affidavit at ¶ 6). The research component of the merit score is composed of the following factors: quantity of research publications (15%); quality of publications (15%); and amount of external funding obtained to support the faculty member's research (30%). (Day Depo. 39:10–40:11). Dr. Day understood that he was evaluated under the merit matrix system and "found no problem with those percentages for the department as a whole." (Day Depo. 31:1–36:20). Under this system, the Dean of the College of Arts and Sciences has the discretion to accept or reject any salary recommendations from the Department. Ultimately, the salary recommendations must be approved by the UNL Chancellor, the President of the University, and the UNL Board of Regents. (Song Affidavit at ¶ 8).

The Executive Committee and the Department Chair operate under a generally accepted definition of "external funding." The Committee defines external funding as financial support for research projects received from sources outside UNL, such as federal agencies, the National Science Foundation, the National Institute of Health, or the American Cancer Society. (Song Affidavit at ¶ 10; Day Depo. 39:10–40:11). Faculty members generally receive external funding by submitting detailed research proposals to the funding entities. The proposals are subjected to peer review prior to approval. The Committee maintains that peer review serves as an external control which assures that the proposed research is significant and will contribute to the advancement of knowledge in a particular field. (Song Affidavit at ¶ 10). Once approved, externally funded grants are paid directly to UNL to support research described in the proposals. Funds obtained from grant proposals may be used to acquire laboratory equipment and computers, support graduate, undergraduate, and post-doctoral programs, and help fund other staff and faculty members, as well as meet the Department's overhead costs. (Day Depo. 40:12–42:1; Song Affidavit at ¶ 10).

Dr. Day contends that he has received inadequate yearly salary increases and that his level of compensation is below that of other full professors at UNL. It is undisputed that some young faculty members receive higher salaries than Dr. Day. (Song Affidavit Exhibit 2; Plaintiff's Brief at 34–35). Day alleges that he was not given credit in his merit evaluations for research conducted at the Crystalytics laboratory in his home. However, Dr. Day admits that he has been advised since 1980 that his research at Crystalytics does not meet the definition of "external funding" which is used by the Department in evaluating faculty. (Day Depo. 42:19–44:13). In addition, Dr. Day acknowledges that he began receiving low raises in about 1979 or 1980, around the time when he established his research laboratory out of the

Chemistry Department. (Day Depo. 82:10–83:25). He also acknowledges that the highest paid faculty members are older than he. (Day Depo. 391:14–16). The defendants claim that Dr. Day's relatively low salary is the result of his low level of contribution to the Chemistry Department as reflected by several years of low merit evaluation scores. (Song Affidavit at ¶ 13). In addition, the defendants contend that Dr. Day has never applied for or obtained any grants which meet the Committee's definition of external funding and Day presents no evidence to the contrary. (Song Affidavit at ¶ 13; Day Depo. 42:19–44:13).

Dr. Day claims that defendants Song and the Board of Regents violated his: (1) Freedom of Speech; (2) Freedom of Association; (3) Due Process rights; (4) Equal Protection rights; (5) the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.*; and (6) state based contract law. This court has jurisdiction over plaintiff's constitutional claims under 28 U.S.C. § 1983 and the state based contract claim under the court's supplemental jurisdiction, 28 U.S.C. § 1367.

## DISCUSSION

■ Federal Rule of Civil Procedure 56(c) mandates entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of a motion for summary judgment is to determine whether a "genuine issue of material fact" exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. at 2510. A "genuine issue" regarding a material fact exists "if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Id.*

■ Summary judgment is properly granted when, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, it is clear no genuine issue of material fact remains and the case

may be decided as a matter of law. *Greeno v. Little Blue Valley Sewer Dist.*, 995 F.2d 861, 863 (8th Cir.1993). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, the burden then shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Defendants seek summary judgment on each of the claims raised by plaintiff. Each claim is addressed separately below.

### (1)(a) Freedom of Speech: Plaintiff's Research Publications

■ Public employees are not, by virtue of becoming public employees, shorn of First Amendment protection. *Mt. Healthy City Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). However, the state, as an employer, has a legitimate interest in regulating the speech of its employees. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Eighth Circuit has outlined a two-step approach for determining whether a public employee's speech is protected by the First Amendment. *See e.g. Kincade v. City of Blue Springs*, 64 F.3d 389, 395 (8th Cir.1995); *Tindle v. Caudell*, 56 F.3d 966, 970 (8th Cir.1995); *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir.

1993). The first step is to determine whether "the employee's speech can be 'fairly characterized as constituting speech on a matter of public concern.'" *Shands*, 993 F.2d at 1342 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). If the speech addresses a matter of public concern, the second step requires the court to balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Kincade*, 64 F.3d at 395. Both inquiries are questions of law for the court to resolve.[2] *Kincade*, 64 F.3d at 395.

Dr. Day argues, however, that the *Connick–Pickering* public concern analysis does not apply to his claim that the defendants violated his First Amendment rights with respect to his research and scholarly publications. (Plaintiff's Brief at 16–18). He relies on *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir.1994), as authority for his contention that the public concern requirement applies only in cases where "the public employee was merely complaining privately about matters personal to himself, such as whether he was being paid enough or given

deserved promotions ... or ... he was whistleblowing or otherwise "going public" with matters in which the public might be expected to take interest." *Id.*

In *Eberhardt*, a prosecutor's office discharged an assistant district attorney after he began working on a novel which involved "fictitious prosecutors and other persons in the criminal justice system." *Id.* at 1024. Eberhardt did not work on the manuscript during office hours and the novel apparently did not focus on internal matters of the actual office in which he worked. *Id.* at 1025. The Seventh Circuit concluded that *Connick* public concern requirement does not apply where "the protected expression has nothing to do with the employee's job or with the public interest in the operation of his office." *Id.* at 1027. "[T]he purpose of the 'public concern' requirement is to distinguish grievances of an entirely personal character from statements of broader interest concerning one's job, rather than to fix the boundaries of the First Amendment." *Id.* at 1026 (quoting *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.1990)).

While the Seventh Circuit's reasoning in *Eberhardt* is persuasive, I conclude that Dr. Day's allegations with regard to his research publications do not invoke First Amendment concerns.[3] First, Dr. Day has stated that he

---

2. The Eighth Circuit provided in *Shands*:

 Any underlying factual disputes concerning whether the plaintiff's speech is protected, however, should be submitted to the jury through special interrogatories or special verdict forms.... The trial court should then combine the jury's factual findings with its legal conclusions in determining whether the plaintiff's speech is protected.

 If any speech is found to be protected under the above analysis, the plaintiff must show that the protected speech was a substantial, or motivating, factor in the defendant's decision to discharge him. If the plaintiff meets this burden, the burden then shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have been discharged regardless of the protected speech activity. These two causation questions are questions of fact for the jury.

 993 F.2d at 1342–43 (citations omitted).

3. Plaintiff also argues that he "has been penalized for his research and publication done in his home and outside the university...." (Plaintiff's Brief at 22). Therefore, he asserts that he cannot be punished for speech which was "done at

home and not at work...." (Plaintiff's Brief at 22). To support his argument plaintiff cites *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989). In that case three police officers who owned a video rental store which contained legal "adult" films were reprimanded for their conduct. The Tenth Circuit determined that *Flanagan* involved " 'speech' which [was] off the job and unrelated to any internal functioning of the department." *Id.* at 1562. Here, however, plaintiff's employment is connected to the speech at issue—the research which he has published. (Song Affidavit at ¶ 19; Plaintiff's Brief at 9–10). Plaintiff's publication of research articles is highly related to his employment as an academic scholar at UNL. *See Tindle v. Caudell*, 56 F.3d 966, 970–71 (8th Cir.1995). Moreover, plaintiff's argument is contrary to his contention that he should have been given credit by the defendants for research conducted through Crystalytics. (*See* Amended Complaint at ¶ 16–23). If the "speech" conducted at his home is private as he suggests, then it is disingenuous for the plaintiff to argue that he should have been given credit for this "speech" when his salary level was determined.

feels free to conduct any research which he wants. (Day Depo. 108:13–18). In addition, he admits that the defendants have not interfered with or prohibited him from publishing articles or conducting any research which he wants. (Day Depo. 106:4—107:9, 108:16–18). Rather, he claims that the defendants "punished him" by refusing to give him credit for research he conducted at his home when salary increases were determined. (Amended Complaint at ¶ 16–23). The First Amendment, however, protects freedom of expression. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–572, 111 S.Ct. 2456, 2460–2464, 115 L.Ed.2d 504 (1991); *Texas v. Johnson*, 491 U.S. 397, 403, 109 S.Ct. 2533, 2538–39, 105 L.Ed.2d 342 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–3069, 82 L.Ed.2d 221 (1984); *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). There is no evidence which suggests that the defendants have done anything to interfere with the *content* of the speech contained in Dr. Day's published articles.[4]

If Dr. Day had conducted the same research on the UNL campus and published the same articles and papers using that information, there is no evidence that he would not have been given some credit for that research when salary levels were determined. (Day Depo. 39:7–40:7). Day claims only that he is not able to conduct his research where he wants, not that the defendants have prohibited him from saying anything that he wants. (Day Depo. 106:4–

107:9, 108:13–18). As such, I conclude that the denial of credit in salary level determinations for research conducted at plaintiff's home does not invoke the First Amendment.[5] The denial of credit was based on Dr. Day's absence from the chemistry department and not on the contents of the research which he published. *See Weinstein v. University of Illinois*, 628 F.Supp. 862, 866 (N.D.Ill.1986) (assistant professor not entitled to First Amendment protection where he failed to establish that the "defendant's decision to terminate him was in any way prompted by the content of plaintiff's various projects.").

### (1)(a) Freedom of Speech: Plaintiff's Statements

■ Dr. Day argues that he has made statements challenging the fairness of UNL chemistry department policies. Specifically, Dr. Day asserts that he has stated, "it is irresponsible of academicians to train students for careers in chemistry unless there are a sufficient number of jobs to place them after they have completed their studies." (Day Affidavit at ¶ 22). In addition, he alleges that he complained to defendant Song, UNL Chemistry Professor Robert Rieke, UNL Arts and Sciences Dean John Peters, and the UNL Senior Vice–Chancellor for Academic Affairs about his salary and tenure status.[6] (Day Affidavit at ¶ 13 and 24). Finally, Day alleges that he complained to other UNL administrators about listing his UNL and Crystalytics affiliation on his published articles.[7] (Day Affidavit at ¶ 16).

---

4. For example, there are no allegations that plaintiff did not receive credit for his research because he expressed ideological or political views in his publications which were unpopular with the administration.

5. *Cf. Greer v. Spock*, 424 U.S. 828, 839, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976) (rejecting alleged First Amendment right to have a political candidate speak at a military base when member of the Armed Forces stationed at the base were free to attend political rallies off base); *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 566–67 & n. 12, 92 S.Ct. 2219, 2227–2228 & n. 12, 33 L.Ed.2d 131 (1972) (rejecting alleged First Amendment right to distribute handbills in privately-owned shopping center, partly on the basis that surrounding public roads and sidewalks provided adequate alternative public forums for disseminating a message); L. Tribe, *American Constitutional Law*, § 12–23, at 982. ("Unless the

inhibition resulting from such a content-neutral abridgement is significant, government need show no more than a rational justification for its choice; and if equally effective alternatives are readily available to the speaker or listener, the inhibition is not deemed significant.").

6. Plaintiff also argues in his brief that he filed grievances with UNL regarding his complaints. (Plaintiff's Brief, at 19). However, he does not cite any evidence of filing such grievances and none appears in his affidavit.

7. I note that none of these allegations is contained in plaintiff's complaint or amended complaint. However, I shall consider the merits of plaintiff's allegations for purposes of this summary judgment motion, because plaintiff could potentially amend his complaint to conform with this evidence. *See generally* J. Moore, *Moore's*

Dr. Day concedes that the *Connick–Pickering* test applies to his criticisms of UNL. (Plaintiff's Brief at 19). Therefore, the first step is to determine if his speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The Eighth Circuit recently addressed a situation where a assistant architecture professor claimed that Iowa State University (ISU) officials had violated his freedom of speech when he allegedly was denied tenure for being "openly critical of what he considered to be unsound teaching and administrative practices within the department." *Mumford v. Godfried,* 52 F.3d 756, 758 (8th Cir.1995). Mumford criticized the department for letting the local architectural business community exert undue influence over the curriculum and education at ISU. Mumford had stated that the university's relationship with the business community was "potentially unethical because the business community was motivated by financial pursuits rather than the academic interests of the students and ISU." *Id.* The Eighth Circuit held that Mumford's speech was a matter of public concern even though he expressed his views only to fellow faculty members at ISU.[8] *Id.* at 761–62.

However, Dr. Day's complaints about his salary, his tenure status, and listing his UNL affiliation on his research publications are unlike the statements made in *Mumford.* Dr. Day alleges that he was denied status as a full professor in 1984 and challenged UNL Professor Rieke to explain his reasons for voting against plaintiff's denial. (Day Affidavit at ¶ 11–13). In addition, he alleges that in 1991 he complained to several UNL officials about defendant Song's application of the guidelines used to determine his salary. (Day Affidavit at ¶ 24). Dr. Day also asserts that he complained to UNL officials about a requirement that he list his affiliation with UNL on his research publications. (Day Affidavit at ¶ 16). All of these statements, however, involve complaints about UNL's treatment of plaintiff as an employee.

▉▉▉▉ These statements relate to Dr. Day's own salary level, his own tenure status, and his own desire not to include his UNL affiliation on his publications. "Where a public employee speaks out in public or in private on matters that relate solely to the employee's parochial concerns as an employee, no first amendment interests are at stake...." *Mumford v. Godfried,* 52 F.3d 756, 760 (8th Cir.1995) (quoting *Cox v. Dardanelle Public School District,* 790 F.2d 668, 672 (8th Cir.1986)). Unlike *Mumford,* Dr. Day was not criticizing the institution for failing to discharge its duties to the public. At best, his statements were "concerned only with internal policies or practices which are of relevance only to the employees of that institution." *Mumford v. Godfried,* 52 F.3d 756, 760 (8th Cir.1995) (quoting *Cox v. Dardanelle Public School District,* 790 F.2d 668, 672 (8th Cir.1986)). Thus, I conclude that Day's complaints to UNL officials regarding his salary and the listing of his UNL affiliation on his publications are not matters of public concern. *See Kurtz v. Vickrey,* 855 F.2d 723 (11th Cir.1988) (professor's complaints about his salary level and expressions of his personal contempt made to a departmental dean were not a matter of public concern).

Finally, Dr. Day asserts:

I have also always felt that it is irresponsible of academicians to train students for careers in chemistry unless there are a sufficient number of jobs to place them after they complete their studies. I have often stated this.

(Day Affidavit at ¶ 22). While Dr. Day's statement is a matter of public concern, *see Mumford v. Godfried,* 52 F.3d 756, 760 (8th Cir.1995); *Honore v. Douglas,* 833 F.2d 565 (5th Cir.1987), his statement fails to constitute a triable issue of fact for two reasons. First, Day has provided no evidence that this

---

*Federal Practice,* § 56.10, at 56–92 through 56–97.

**8.** *See also Honore v. Douglas,* 833 F.2d 565 (5th Cir.1987) (law school professor stated a claim for a first amendment violation where he had been denied tenure after criticizing the law school's admissions policy, size of the student population, administration of the school budget, and failure to certify graduates for the Texas bar examination in a timely fashion).

statement was "a substantial and motivating factor in the [denial of an employment benefit]." *Hamer v. Brown,* 831 F.2d 1398, 1403 (8th Cir.1987) (citing *Mt. Healthy City Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). As such, he fails to establish a causal relationship between his protected speech and lower salary increases. *Hamer,* 831 F.2d at 1403. Second, material submitted in opposition of a summary judgment motion must consist of admissible evidence. *Fed.R.Civ.P.* 56(e) (affidavits "shall set forth such facts as would be admissible in evidence"); *Miller v. Solem,* 728 F.2d 1020, 1026 (8th Cir.1984) (same). Dr. Day's statement lacks foundation as to the date and location when such statements where allegedly made, as well as to whom he made the statements and whom was present at the time. Thus, Day's statement fails to meet the admissibility requirement of Rule 56(e). As such, plaintiff has failed to produce evidence which supports his contention that a genuine issue of material fact exists with regard to his freedom of speech claims and I conclude that defendants' motion for summary judgment should be granted as a matter of law.

### (2) Freedom of Association

Dr. Day claims that his constitutional right to freedom of association has been infringed by the defendants' denial of credit for research done at Crystalytics in determining the level of his salary increases. (Amended Complaint at ¶ 23; Plaintiff's Brief at 23). While the First Amendment on its face does not specifically mention the right to freedom of association, the United States Supreme Court has declared that the First Amendment encompasses a right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). The Supreme Court has

afforded constitutional protection to freedom of association in two distinct senses. First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities.

*Board of Dirs. of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). However, freedom of association "while protecting the rights of citizens to engage in 'expressive' or 'intimate' association, does not protect every form of association." *United States v. Frame,* 885 F.2d 1119, 1131 (3rd Cir.1989) (citing *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989)).

Under the first branch, freedom of association protects "certain kinds of highly personal relationships . . . from unjustified interference by the State." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984). Protected associations "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain affiliation, and seclusion from others in critical aspects of the relationship." [9] *Id.* at 620, 104 S.Ct. at 3250. Freedom of association under the second branch of Supreme Court cases involves "a right to join with others to pursue goals independently protected by the [F]irst [A]mendment." *Walker v. City of Kansas City, Mo.,* 911 F.2d 80, 89 (8th Cir.1990) (quoting L. Tribe, *American Constitutional Law* 702–03 (1978)). "Assuming an association is found, therefore, any activity that would merit First Amendment protection if engaged in outside the context of the association will suffice to constitute a right of association." *Walker,* 911 F.2d at 89.

**9.** "[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees." *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3251. Although plaintiff's wife is a partner in Crystalytics, plaintiff does not contend that the defendants' have interfered with his "marriage relationship." (Day Depo 99:1–100:12; Plaintiff's Brief at 23; Amended Complaint at ¶ 16–23).

Dr. Day claims that the defendant's have violated his right of association to conduct research and publish his findings with his corporation Crystalytics.[10] (Plaintiff's Brief at 23). However, he provides no evidence that the defendants prohibited him from exercising his constitutional rights. Day admits that the defendants did not interfere with or prohibit him from publishing articles or conducting any research which he wanted. (Day Depo. 106:4–107:9, 108:16–18). Although defendant Song warned Dr. Day that he would not be given credit for research conducted off the UNL campus, (Plaintiff's Brief at 7; Day Affidavit at ¶ 17), he was free to continue doing so with the understanding that his salary would be set accordingly. (Day Depo. 106:4—107:9, 108:16–18; Day Affidavit at ¶ 17). Dr. Day wrote UNL officials on several occasions stating that he had and would continue to publish articles without

listing his UNL affiliation,[11] (Day Depo. Exhibits 11, 14, and 18), and expressed his satisfaction with that arrangement. (Day Depo. Exhibit 10). While UNL, as an employer, did not credit Day with research conducted at his home laboratory in salary level determinations, (Plaintiff's Index of Evidence—Song Depo. 42:14–47:23), Dr. Day was free to research and publish as much as he wished with Crystalytics on his own time. (Day Depo: 106:4–107:9, 108:16–18, Exhibit 14). Therefore, I conclude that there is no evidence that the defendants' actions violated Day's freedom to associate with Crystalytics during his free hours. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

▪ Even assuming Dr. Day had associational rights which were affected by the defendants' conduct during the hours he was to devote to his employment with UNL,[12] the

10. Plaintiff argues in his brief and his attorney suggests in his deposition that some research collaborations between the plaintiff and other academics may be involved in his freedom of association claim. (Day Depo. 99:22–25). However, no such facts have been pleaded in plaintiff's amended complaint. (*See* Amended Complaint, at ¶ 16–23). Moreover, following his attorney's suggestion Dr. Day states:

A. I suspect—okay. To be honest with you, I suspect that the department people in the department have resented the fact that I collaborate with people elsewhere. *I've not got any hard evidence of that but that might be an issue as well. I don't know.*
Q. (By Mr. Buntain) You say you suspect that that might be the case? But do you have anything to base that suspicion on?
A. No. Maybe that's what the problem is. I've been trying for three years to find out what the problem is.

(Day Deposition 100:1–12) (emphasis added). Furthermore, Day admits that his concerns have not prevented him from collaborating with other researchers around the country. (Day Deposition 105:1–23). Because he admits that he has no evidence of a violation of his associational rights with respect to his collaborations with other academics outside the University, plaintiff has not met his burden of establishing that his lower salary increases resulted from an exercise of his constitutional rights. *See Hamer v. Brown*, 831 F.2d 1398, 1403 (8th Cir.1987) (citing *Mt. Healthy City Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)) (plaintiff bears that burden of establishing the exercise of a constitutional right was a substantial and motivating factor in denial of a benefit).

11. For example, Dr. Day sent a copy of one such article to UNL Arts and Sciences Dean Gerhard Meisels stating, "It is the first of many non-UNL publications by me; I hope to have at least ten per year in the future." (Day Depo. Exhibit 18). In another letter to Meisels, Day stated that he would continue to publish articles without listing his UNL affiliation "on any publications resulting from research conducted by me on my own time at Crystalytics Company." (Day Deposition: Exhibit 14).

12. Plaintiff has not shown whether his wife contributed to the materials published by plaintiff in academic journals. (Day Depo 91:25–94:4). Thus, he has not demonstrated that he engaged in protected speech activities *"with others* to pursue goals independently protected by the [F]irst [A]mendment." *Walker v. City of Kansas City, Mo.*, 911 F.2d 80, 89 (8th Cir.1990) (quoting L. Tribe, *American Constitutional Law* 702–03 (1978)) (emphasis added). In addition, Crystalytics is unlikely to qualify as an intimate or private relationship worthy of associational protection under the first branch of the Supreme Court's case. *Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir.1990) (finding no freedom of association violation partly because of group's "quasi-business" activities); *Oklahoma Educ. Ass'n v. Alcoholic Bev. Laws Enf. Comm'n*, 889 F.2d 929 (10th Cir.1989) (no violation of right to association for state employees working in the alcoholic beverage business); *Copp v. Unified School Dist. No. 501*, 882 F.2d 1547 (10th Cir.1989) (no right of association between two school employees); *Rivers v. Campbell*, 791 F.2d 837, 840 (11th Cir.1986) ("the more commercial the associational interest involved the less likely first amendment protection attaches"); *Trade*

Eighth Circuit recently held that courts should apply a modified *Pickering* analysis to cases involving alleged First Amendment rights by public employees beyond freedom of speech. *Brown v. Polk County*, 37 F.3d 404, 409 (8th Cir.1994). In that case, the Eighth Circuit noted that "*Pickering*'s rationale—that the government as an employer has a special interest in regulating its employee's behavior to avoid the disruption of public functions—applies to free exercise rights as well as free speech rights." *Id.* The court noted with approval that other circuits have "applied a *Pickering* analysis outside the speech context in cases involving expressive association rights...." *Id. See e.g. McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir.1994); *Marshall v. Allen*, 984 F.2d 787 (7th Cir.1993); *Gressley v. Deutsch*, 890 F.Supp. 1474 (D.Wyo.1994); *Lowenstein v. Wolff*, 1994 WL 411389 (N.D.Ill.1994). There is no reason that the Eighth's Circuit's rationale in *Brown* should not apply to the case at hand.

■ I therefore conclude that the court is required to balance the interests of the employee in the association against "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Lowenstein v. Wolff*, 1994 WL 411389 (N.D.Ill.1994) ("an employer may discharge the public employee for that association 'if the government's interest in the 'effective and efficient fulfillment of its responsibilities to the public' outweighs the employee's interest' in association") (quoting *Marshall v. Allen*, 984 F.2d 787, 797 (7th Cir.1993)). In this case it is apparent that the defendants have a legitimate interest in requiring Dr. Day to conduct his research and publishing activities at his place of work—the UNL campus.[13] UNL's

interest lies in increasing student access to Dr. Day, facilitating supervision of a greater number of students in graduate programs by Dr. Day, increasing UNL's reputation in the academic community for research conducted on its campus, and increasing the sources of external funding to support the Chemistry Department.[14]

Dr. Day admits that he has supervised, at most, four graduate students in the fifteen years since establishing his laboratory in his home in 1980. (Day Depo. 59:17–22). He also admits that he retains 600 square feet of unused laboratory space at UNL. (Day Depo. 45:3–19). Moreover, there is no evidence that Day has obtained any external funding grants, such as grants from federal agencies, while working out of his home laboratory. (Day Depo. 40:12–44:13). Dr. Day stated the following justification for moving his laboratory to his home:

[T]o be perfectly honest with you, it's much nicer to walk down the hall when you got something to do, do it and go do something else than it is to work in there with people in an environment that is very nonconvenient with dust. You don't have any interruptions.

And basically as long as I didn't have any graduate students or undergraduates doing research with me, it's a hell of a lot easier to do it at home. So I did, I have. And the University was fully aware of it.

(Day Depo. 50:4–14). The First Amendment does not require an employer to yield to an employee's notions of convenience in allowing the employee to engage in his private business pursuits. As the defendants state, "If Dr. Day were to succeed here, he could elect to do his research at a laboratory in Omaha (or anywhere else), come into the Department just long enough to teach his classes, and still expect to be given large raises based

---

*Waste Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 238 (3rd Cir.1985) (economic associations receive less protection than political or social associations); *Mass v. McClenahan*, 893 F.Supp. 225 (S.D.N.Y.1995) (business relationship formed between an attorney and a client did not warrant associational protection).

**13.** *Cf. FCC v. Beach Comm., Inc.*, 508 U.S. 307, ——, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211

(1993) ("a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.")

**14.** The external funding grants supports UNL's overhead as well as the work of graduate, undergraduate, and post-doctoral students. (Day Depo. 40:12–44:13).

solely on the quality of his off-site research." (Defendants' Brief at 13). The evidence establishes that, contrary to plaintiff's assertions, he was restricted in salary increases not for what he did off campus, but rather for what he failed to do on campus. The University's interests in this arena are legitimate and its actions reasonable. Day has and remains free to conduct research for publication during his own time with Crystalytics. (Day Depo. 106:4–107:9, 108:16–18, Exhibit 14). I conclude that "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs Dr. Day's interest in his association with Crystalytics during the hours he is fulfilling his obligations to UNL. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Viewing all of the submitted evidence in a light most favorable to Dr. Day, I conclude that he has not shown the existence of a material factual dispute regarding defendants' liability on this issue. I therefore shall grant defendants' motion for summary judgment as a matter of law with respect to Dr. Day's First Amendment claims.

### (3) Due Process

█ Dr. Day claims that the defendants' have "intentionally deprived [him] of a property interest in his employment which resulted in significant lost income" to him without due process of law. (Amended Complaint at ¶ 20 and 23). He contends that the defendants have failed to grant him annual raises in amounts which he believes are merited by his academic record. (Amended Complaint at ¶ 8–20).

█ The Eighth Circuit has held that "a government employee is entitled to procedural due process only when he has been deprived of a constitutionally protected property or liberty interest." *Winegar v. Des Moines Indep. Com. School Dist.*, 20 F.3d 895, 899 (8th Cir.1994).

> A person must have a legitimate claim of entitlement to his or her employment to have a property interest in it. The existence of a property interest must be determined with reference to state law. Typically, this interest arises from contractual or statutory limitations on the employer's ability to terminate an employee....

*Id.* at 899 (citations omitted). *See also Blankenbaker v. McCook Public Power Dist.*, 940 F.2d 384 (8th Cir.1991) (a property interest normally arises from regulatory or contractual provisions which constrain the employer or confer a benefit on the employee).

While Dr. Day claims that he has not received salary increases which he believes his academic record merits, he has offered no evidence of any statute, regulation, rule, or contractual provision which would entitle him to receive any raise, let alone one of a specific amount.[15] In addition, the Nebraska Court of Appeals has stated that a public employee does not have a right to a particular salary increase under Nebraska state law without a contractual or legislative entitlement. *Sinn v. City of Seward*, 3 Neb.App. 59, 66–67, 523 N.W.2d 39, 45–46 (1994). Day's claim to larger salary raises is highly speculative at best and there is no evidence that he has lost any "pay, benefits, job status, or tenure[ ]" to which he had an entitlement.

---

15. Plaintiff cites a number of cases for the proposition that he has a property interest in his job as a tenured public employee. *See Williams v. Texas University Health Sciences Center*, 6 F.3d 290 (5th Cir.1993) (medical school faculty member's salary reduced from $68,000 to $46,449 a year); *Post v. Harper*, 980 F.2d 491 (8th Cir.1992) (discharged tenured employee had property interest in his employment); *Eguia v. Tompkins*, 756 F.2d 1130 (5th Cir.1985) (employee had due process interest in salary and expense reimbursement withheld by employer); *Ginaitt v. Haronian*, 806 F.Supp. 311 (D.R.I.1992) (termination of pension and medical benefits was termination of benefit in which employee had property interest). However, in each of those cases, the court specifically found that the public employee had a right to continuation of the salary or benefits previously granted by the employer. Although Day may have a property interest in his tenured position, none of the cases cited supports his assertion that he has a property interest in future wage increases. As the Supreme Court stated in *Board of Regents v. Roth*, in order to have a property interest in a benefit, plaintiff must have

> more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

*Miller v. Lovell,* 14 F.3d 20, 21 (8th Cir.1994). Thus, I conclude that Day has failed to establish that he has been deprived of a constitutionally protected property interest by the defendants which would entitle him to procedural due process protections. "The Fourteenth Amendment's Due Process Clause does not convert the federal courts into arbitral forums for review of commonplace personnel decisions that public agencies routinely make." *Miller v. Lovell,* 14 F.3d 20 (8th Cir.1994). I shall therefore grant the defendants' motion for summary judgment on this issue.

### (4) Equal Protection

■ The final constitutional deprivation alleged by Day is that he has been denied equal protection of law under the Fourteenth Amendment. (Amended Complaint at ¶ 23). "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920)). While Dr. Day is exceptionally vague about the nature of the classification which he alleges violated his constitutional rights, he apparently challenges the use of the salary matrix by the defendants in establishing UNL Chemistry Department salaries. (Plaintiff's Brief at 26). However, Dr. Day concedes that "the classification for salary purposes does not proceed along suspect lines." (Plaintiff's Brief at 24).

■ "Equal protection is not a license for courts to judge the wisdom, fairness, or logic of [governmental decisions]." *FCC v. Beach Comm., Inc.,* 508 U.S. 307, 313, 113

S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). "Purely economic classifications will be upheld if they are rationally related to a legitimate governmental interest." *Massey v. McGrath,* 965 F.2d 678, 681 (8th Cir.1992) (citing *United States Railroad Ret. Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)). *See also Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Bannum, Inc. v. City of St. Charles, Mo.* 2 F.3d 267 (8th Cir.1993). Because the treatment which Day challenges does not involve a suspect classification or impinge upon fundamental rights, a presumption of rationality attaches to the classification at issue. *Massey,* 965 F.2d 678 (8th Cir.1992) (citing *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981)).

Dr. Day argues that he has been penalized in salary level determinations by application of the salary matrix system and asserts that the system should be administered in a different way. (Day Depo. 67:21–68:23, 71:18–73). However, he also objects to the weighting of the percentages for teaching, research, and service, as applied to him, even though, he "found no problem with those percentages for the department as a whole." (Day Depo. 36:19–20). Day argues that "the question of whether or not the classification has a rational basis aside, the application of this salary matrix was such that similarly situated people did not get treated alike, and the result of the application would have no rational basis." (Plaintiff's Brief at 24–25). However, Dr. Day misframes the issue as a factual inquiry to avoid summary judgment on this claim.[16] The evidence is clear that Dr. Day was not treated alike because he did not obtain exter-

---

16. Day argues that his claim is fact-dependent so that summary judgment on the issue would be improper. (Plaintiff's Brief at 24). However, plaintiff has provided no evidence which suggests that the defendants have done anything other than follow a policy of denying him credit for research which is not supported by external grants. Moreover, plaintiff admits that he has "nothing that suggests that a different formula was used for faculty member[s] within the Chemistry Department." (Day Depo. 71:7–22).

Day also argues that the court is not able to analyze whether the defendants' conduct met the rational basis test until the facts are weighed at trial and that the defendants have put forth no evidence "why the salary matrix is rational[ ] and why then the result is not equal." However, policy choices by government officials are "not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Comm., Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993). In addition, as stated above, a presumption of rationality attaches to the defendants' classification, because there is no evidence that the classification was based on suspect criteria or impinged on fundamental rights. *Massey,* 965 F.2d at 681.

nal funding grants to support his research. (Song Affidavit at 5; Plaintiff's Brief at 26; Day Depo. 40:12–42:1, 84:20–85:11). As Dr. Day admits, he was "penalized not because of a failure to do research, but because his research is not supported by an external grant." (Plaintiff's Brief at 26).

It was neither arbitrary nor irrational for the defendants to deny credit to Day for research which was not supported by external funding in making salary determinations under the merit matrix system.[17] External funding is paid directly to UNL and is used to support graduate, post-doctoral, and undergraduate students and staff, as well as salaries for faculty members. (Day Depo. 40:12–42:1; Song Affidavit at ¶ 10). Research funds are also used to acquire equipment, computers, and other research capital for the Department and for the University. (Song Affidavit at 4). It was neither arbitrary nor irrational as plaintiff suggests for the defendants to determine that research conducted at Day's home laboratory through Crystalytics did not meet this requirement, (Day Depo. 42:19–44:13), because UNL did not receive money to support its programs. Although Dr. Day contends that external grants are often "break-even propositions[ ] or money losers for UNL," (Plaintiff's Brief at 9), the defendants' classification decision must be upheld if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comm., Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). As such, I conclude that the defendants are entitled to summary judgment on this issue.

### (5) Age Discrimination

■ Dr. Day alleges that the defendants have discriminated against him on the basis of his age by giving younger faculty members more favorable pay increases than those given to him. (Amended Complaint at ¶ 26–27). The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634, forbids employment discrimination against workers forty years of age or older. Section 623(a)(1) of the act provides that it is unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1). The allocation of the burden of proof in ADEA cases "is the same as in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–17 (1988)[.]" *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444 (8th Cir.1993). Dr. Day argues that he is entitled to relief under disparate treatment and disparate impact theories.

### (a) Disparate Treatment

■ The issue under a disparate treatment theory is whether "[t]he employer ... treat[ed] some people less favorably than others because of their race, color, religion, sex, or [other protected status]." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). "[L]iability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). A plaintiff may prove discrimination under a disparate treatment theory with direct or indirect evidence. *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991); *Blake v. J.C. Penney Co.,* 894 F.2d 274, 278 (8th Cir.1990). If an employee produces direct evidence that his age "played a motivating part in [the] employment decision," then the defendant may "avoid a finding of liability only by proving by a preponderance of the evidence that it

---

**17.** This is true regardless of whether externally funded research was a written requirement of plaintiff's job as a tenured faculty member. (Plaintiff's Index of Evidence, Exhibit 5). There is no dispute that plaintiff and other UNL faculty were encouraged to seek out external grants. (Day Depo. 40:12–44:3). Plaintiff understood that the components of the merit matrix system weighted the quality of his publications at 15 percent, the quantity of his publications at 15 percent, and the external funding he received at 30 percent. (Day Depo 39:10–40:11). He also understood that in externally funded research, the proposals are subject to peer review, the money goes directly to Chemistry Department to support its overhead, and that the money is often used to support the work of graduate, undergraduate, and post-doctoral students. (Day Depo. 40:12–42:1). Thus, he understood that his research at Crystalytics did not meet those criteria. (Day Depo. 42:19–44:13).

would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989).

In this case Dr. Day concedes that he has no direct evidence of discrimination, such as incriminatory statements made by the defendants, which would support his claim. (Day Depo. 394:18–395:3; Plaintiff's Brief at 36). Therefore, the court must apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny. *Gaworski v. ITT Comm. Fin. Corp.,* 17 F.3d 1104 (8th Cir.1994).

> Under this framework, the plaintiff has the burden of establishing a prima facie case of discrimination. Once established, the prima facie case raises a legal presumption of discrimination in the plaintiff's favor, requiring the defendant to produce legitimate, non-discriminatory reasons for its actions. If such reasons are put forth, the plaintiff, who at all times retains the burden of proving discrimination, may attempt to demonstrate that the proffered reasons are pretextual. This framework is designed as a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."

*Id.* at 1108 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citations omitted)). If the defendants produce a non-pretextual reason for the conduct "the factual inquiry proceeds to a new level of specificity." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The Eighth Circuit has held that in order to "survive summary judgment at the third stage of the *McDonnell Douglas* analysis, a plaintiff must demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant[s'] proffered reason is pretext and that the real reason for its action was intentional discrimination." *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995). *See also Lidge–Myrtil v. Deere & Co.,* 49 F.3d 1308 (8th Cir.1995). "[T]here must be some additional evidence beyond the elements of the prima facie case to support a finding of pretext." *Krenik,* 47 F.3d at 959.

The large majority of age discrimination and Title VII cases involve employers who have discharged or failed to hire plaintiffs. The Eighth Circuit has followed the framework of *McDonnell Douglas* in analyzing those cases. The prima facie case under a typical *McDonnell Douglas* scenario requires the plaintiff to prove (1) that he was within the protected class, (2) that he was performing his job at a level that met his employer's legitimate expectations, (3) that he was discharged, and (4) his employer attempted to replace him. *See e.g. Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444 (8th Cir.1993). I also note that the parties have proposed similar requirements for a prima facie case.[18] Therefore, I conclude that Day must demonstrate that he (1) is a member of the protected class, (2) has performed his job

---

18. Plaintiff would require that *a* younger similarly situated person has received a higher salary than plaintiff as the final element of the prima facie case. (Defendant's Brief at 36–37). On the other hand, defendants would require that *other* similarly situated younger employees received a higher salary than plaintiff. (Plaintiff's Brief at 37). Plaintiff's suggestion that he be required to prove that only one employee received a higher salary is clearly at odds with the *Marshall* decision and other district courts considering the issue in similar contexts. *See Glass v. Dep't of Energy,* 46 F.E.P. 1890, 1988 WL 57269 (1988); *Fong v. Beggs,* 620 F.Supp. 847, 872 (D.C.1985) (establishing prima facie elements as (1) plaintiff is a member of the protected class, (2) was qualified an eligible for substantial pay increases,

(3) the pay adjustments received were minimal or nonexistent, and (4) that some younger employees received the pay increases that plaintiff expected to receive). I note that the other aspects of the *Fong* approach are inapplicable in this instance because that case dealt only with wage increases. 620 F.Supp. at 872. Here, plaintiff apparently is maintaining that his salary was already lower than other employees when the applicable statute of limitations on this claim began to run. I also note that to the extent the parties interpret the "similarly situated" requirement as pertaining to the performance record of the other employees, I decline to adopt that approach because that issue is more appropriately addressed as defendants' non-pretextual reason for their actions.

at a level that met his employer's legitimate expectations, and (3) has not received a salary comparable to that paid to younger tenured faculty members of the UNL Chemistry Department. *See Marshall v. Pyramid Life Ins. Co.*, 52 F.E.P. 1398, 1400, 1990 WL 58714 (D.Kan.1990).

▮ Upon application of this standard, I conclude that Day has not provided sufficient evidence to prove a prima facie case. There is no dispute that Day is over 40 years old and a member of the protected class. (Defendant's Brief at 37). In addition, there is sufficient evidence to create a genuine issue as to whether he has received a salary comparable to that paid to younger faculty members. (Song Affidavit, Exhibit 2). However, Day has failed to produce sufficient evidence to demonstrate that he has met his employer's legitimate expectations. Among other things, UNL expected Day to mentor graduate students, teach classes, and apply for and receive external funding to support his research and that of the department. (Song Affidavit at ¶ 13). Even assuming that Day has presented a genuine issue as to whether his classroom teaching and mentoring of graduate students met those expectations, (Day Depo. 25:19–27:6, 50:10–53:25), Day admits that since 1980 he has been told that he was expected to apply for and receive external funding,[19] that this criterion was used in

determining merit salary increases, and that research conducted at his home laboratory was not considered to be satisfactory in meeting this criterion. (Day Depo. 42:19–44:13). Dr. Day offers no evidence that he sought or obtained external funding for his research during that time which met his employer's expectations. To the contrary, the evidence that he failed do so is uncontradicted. (Day Depo. 42:19–44:13; Song Affidavit at ¶ 13).

An employer may not establish unrealistic expectations for an employee. *O'Bryan v. KTIV Television*, 868 F.Supp. 1146 (N.D.Iowa 1994). *See also Meiri v. Dacon*, 759 F.2d 989, 995 (2nd Cir.1985) (an employee may show that the employer's demands were illegitimate or arbitrary). Dr. Day argues that a factual dispute exists as to whether the defendants' expectations were reasonable by asserting that he has published more papers, done more research, and taught for more years than many younger faculty members. (Plaintiff's Brief at 40). While these facts may very well be true, they do not create an inference that the defendants' expectation that Dr. Day seek and obtain external funding for his research is unreasonable. Dr. Day offers no other evidence which would support an inference that it was unreasonable to expect him to meet that expectation.[20] "Although an employer

19. Plaintiff argues that the defendant have admitted that obtaining external funding or grants is not a requirement of his job based on the following Plaintiff's Exhibit 5 which is a response to a request for production of documents:

 [Documents Requested:]
 Any documents that state chemistry department faculty have to write grant proposals. *RESPONSE:* There are no documents that "state chemistry department faculty have to write grant proposals." Plaintiff has previously been provided with copies of documents which encourage University of Nebraska–Lincoln Chemistry Department faculty to write grant proposals.
 (Plaintiff's Index of Evidence Exhibit 5). This statement does not contradict defendant Song's statements concerning the Chemistry Department's strong emphasis on research activities, the importance of external funding to the department, and the importance of external funding in evaluating faculty members. (Song Affidavit, ¶ 18–20).
 There is no dispute that plaintiff and other UNL faculty were encouraged to seek out exter-

nal grants. (Day Depo. 40:12–44:3). Plaintiff understood that the components of the merit matrix system weighted the quality of his publications at 15 percent, the quantity of his publications at 15 percent, and the external funding he received at 30 percent. (Day Depo. 39:10–40:11). He understood that in externally funded research, the proposals are subject to peer review, the money goes directly to Chemistry Department to support its overhead, and that the money if often used to support the work of graduate, undergraduate, and post-doctoral students. (Day Depo. 40:12–42:1). That plaintiff was expected to seek and obtain grants is true regardless of whether the expectation was written in terms of a "requirement." Moreover, defendants have not argued that this is a requirement for continued employment.

20. Although Day does not argue the point here, in other portions of his brief he cites to a deposition of defendant Song for the proposition that some externally funded research grants do not cover costs of UNL's overhead. (Plaintiff's Brief at 9). First, defendant Song's testimony was

may not make unreasonable expectations, and must make the employee aware of just what his expectations are, beyond that the court will not inquire into the defendant's method of conducting its business. If [plaintiff] was not doing what his employer wanted him to do, he was not doing his job." *Kephart v. Institute of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir.1980). Dr. Day has failed to offer evidence sufficient to prove that he has met the legitimate expectations of his employer or that his employer's expectations were arbitrary or unreasonable. "It is the non-moving party's burden to demonstrate that there is evidence to support each essential element of his claim." *Leidig v. Honeywell, Inc.*, 850 F.Supp. 796, 801 (D.Minn. 1994) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Day has failed to establish a prima facie case of age discrimination.

■ Even assuming for purposes of argument that Dr. Day had presented a prima facie case, the defendants have provided a legitimate, non-discriminatory reasons for their actions. Specifically, defendants assert that Dr. Day receives a lower salary in comparison to other younger faculty members, because the evaluations of his contribution to the department have been consistently lower than that of the younger faculty members under the merit matrix system. (Song Affidavit at ¶ 13; Defendant's Brief at 39). Therefore, in order to survive summary judgment Day is also required to "demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant[s'] proffered reason is pretext and that the real reason for its action was intentional discrimination." *Krenik v. County of*

*Le Sueur*, 47 F.3d 953, 958 (8th Cir.1995). *See also Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308 (8th Cir.1995). Dr. Day must "produce 'some additional evidence beyond the elements of the prima facie case' that would allow a rational jury to reject [the employer's] proffered reasons as a mere pretext for discrimination." *Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308, 1310–11 (8th Cir.1995) (quoting *Krenik*, 47 F.3d at 959).

Dr. Day concedes that he has no direct evidence of age discrimination. (Day Depo. 394:18–395:3). Instead, he argues that the defendants' emphasis on research and external funding leads it to favor some faculty members over others. However, Day concedes that many faculty members over 40 years of age do research and are not victims of discrimination. (Day Depo. 384:9–19). While it is undisputed that some younger faculty members receive higher salaries than plaintiff, this fact bears no inference of age discrimination because most of Dr. Day's older colleagues also receive higher salaries than him. During the last eight years, Day has received annual raises resulting in a total percentage increase in salary of 38.8%, the lowest increases among the eleven tenured faculty members who have been in the Department for the entire period. These other faculty members have received annual increases ranging from 45.5% to 100%. *All* of these faculty members are older than Dr. Day. (Song Affidavit ¶ 13 & Ex. 2).

The only evidence which potentially provides "some additional evidence" of pretext is a 1988 memorandum to all faculty of the UNL College of Arts and Sciences, concerning factors used in determining salary increases for the 1988–89 academic year.

couched in terms of "It's hard to say ... I haven't done the accounting." (Song Depo. 196:17–22). Moreover, Day provides only one page of the relevant testimony and fails to include two pages of the deposition transcript before and two pages after the testimony to which he cites. (Song Depo. 196:1–25). It is apparent that much of the relevant testimony of defendant Song on this issue was excluded from consideration by the court. Moreover, the context of defendant Song's statements is quite ambiguous from the single page included from his deposition. I am unable to discern whether defendant Song testified that UNL may not break even on some particular external grants, on a wide range

of external grants, on certain parts of research expenses, such as graduate students aiding in the research supported by the grants, or on certain portions of the program funding jointly by the grants and other UNL funding, such as the graduate student program as a whole. (Song Depo. 196:1–25). Finally, I note that use of this testimony to prove that the defendants' job expectations were unreasonable is suspect, because this evidence shows at most that this expectation was not necessarily beneficial to UNL in all cases and not that it was unreasonable to expect plaintiff to be able to meet this requirement. *See O'Bryan v. KTIV Television*, 868 F.Supp. 1146 (N.D.Iowa 1994).

(Plaintiff's Index of Evidence, Ex. 8). One factor is stated in the memorandum as follows:

> *Inversions.* Untenured faculty and more experienced faculty fulfilling departmental performance expectations sometimes earn less than the beginning salary in their departments for fall 1988. The salaries of untenured faculty will be based on beginning salaries, not on the performance record since it is still early to assess their performance.

(Plaintiff's Index of Evidence, Ex. 8). There is nothing in its contents which indicates that younger faculty members were to be given salary increases *merely because of their age.*[21] The stated purpose of the "inversion" system was to "establish marketplace equity at the beginning level" of employment, so that new employees were not paid more than other recently hired faculty members. (Plaintiff's Index of Evidence, Ex. 8). Dr. Day has been employed by UNL since 1972 and provides no evidence that *he* was adversely impacted by such a policy.[22] A cause of action for a diminution in Day's salary during the 1988–1989 academic year is well outside the applicable statute of limitations, and he provides no evidence that this program continued into later years.[23] Moreover, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 1703, 123 L.Ed.2d 338 (1993). The memorandum describes a facially neutral policy of the College of Arts and Sciences and does not provide an inference that age was a motivating factor in the merit based salary level determinations made by members of the Chemistry Department regarding *the plaintiff* such as would allow a jury to infer that the defendants' legitimate, nondiscriminatory reasons for giving Day low merit increases were pretextual.[24]

It is the plaintiff's burden to present evidence which would allow a reasonable jury to return a verdict for him.[25] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Although courts have cautioned that summary judgment should be used sparingly in cases involving issues of motive or intent, this "cannot and should not be construed to exempt employment discrimination cases involving motive and intent from summary judgment procedures." *Krenik,* 47 F.3d 953, 959 (8th Cir.1995). As Dr. Day has failed to present evidence sufficient to establish a prima facie case of discrimination and has failed to present "some additional evidence" sufficient to discredit the defendants' legitimate nondiscriminatory reasons for their conduct, I conclude that summary judgment for the defendants is appropriate on this claim.

### (b) Disparate Impact

 Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive ... is not required under a disparate-impact theory." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The underlying premise of the theory is that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to in-

21. There is no evidence that untenured and less experienced faculty members may not be biologically older than their tenured counterparts. As discussed below, plaintiff fails to provide statistical evidence suggesting that the "inversion" system had a disparate impact on the salaries of older persons.

22. The memorandum specifically states that "some junior faculty will have below average increases.... This year the senior faculty will not be, in effect, subsidizing increases for beginning faculty." (Plaintiff's Index of Evidence, Ex. 8). I note that this language undercuts plaintiff's claim of discrimination against older faculty members.

23. The general limitations period for filing a lawsuit under the ADEA is two years. In cases of willful violations, however, the limitations period is three years. 29 U.S.C. § 255.

24. See *supra,* at note 22.

25. The mere existence of a "scintilla of evidence in support of the plaintiff's position" is insufficient to avoid summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

tentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). "To establish a prima facie case of disparate impact discrimination, a plaintiff must demonstrate that a specific employment practice or policy has a significant discriminatory impact on a protect group." *Leidig v. Honeywell, Inc.*, 850 F.Supp. 796, 802 (D.Minn. 1994) (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989)). This showing is ordinarily made by use of statistical evidence. *Wards Cove*, 490 U.S. at 650, 109 S.Ct. at 2121.[26]

In this case Day argues that elements of UNL's salary administration "appear to impact on him based upon his age...." (Plaintiff's Brief at 38). He suggests that the salary matrix and "salary inversion factors" demonstrate that he has been impacted by UNL's policies. Day admits, however, that he can provide no statistical analysis which establishes an adverse impact on a department wide basis. (Plaintiff's Brief at 39). In addition, he provides no admissible evidence to support his assertions that UNL policies have affected anyone else in the department.[27] As such, Dr. Day has failed to establish a prima facie case of disparate impact discrimination, and defendants are entitled to summary judgment on this claim. *See Leidig v. Honeywell, Inc.*,

850 F.Supp. 796, 802 (D.Minn.1994) (summary judgment is appropriate where plaintiff fails to present sufficient evidence to establish a prima facie case of the disparate impact of an employment policy of practice).

### (6) State Law Contract Claim

Finally, Dr. Day claims that the defendants have violated his employment contract under Nebraska state law. (Amended Complaint at ¶ 2). However, the "threshold requirement in every federal case is jurisdiction." *Barclay Square Prop. v. Midwest Fed. Sav. & Loan Ass'n*, 893 F.2d 968, 969 (8th Cir.1990) (quoting *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir.1987)). Federal courts are courts of limited jurisdiction, *Owen Equip. and Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978), and the jurisdiction of lower federal courts is created entirely by statute. *See Continental Cablevision v. United States Postal Service*, 945 F.2d 1434, 1435 (8th Cir.1991). Congress has provided that a civil plaintiff may bring suit in federal court only if his or her claim "arises under" federal law[28] or diversity jurisdiction exits. *See* 28 U.S.C. § 1331. In the present case all parties are residents or agents of the state of Nebraska. (Amended Complaint at ¶ 4–6; Answer at ¶ 1). Therefore, diversity jurisdiction does not exist with this court. *Owen Equipment & Erection Co. v. Kroger,*

**26.** I note that there is "some doubt about the viability of an ADEA disparate impact claim." *Leidig v. Honeywell, Inc.*, 850 F.Supp. 796 (D.Minn.1994). The Supreme Court has "never decided whether a disparate impact theory of liability is available under the ADEA." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). Several Justices cautioned lower federal courts against interpreting *Biggins* as authority for recognizing such claims. *Id.* at 610 and 617, at 1706 and 1710. However, because the Eighth Circuit recognized ADEA disparate impact claims before the Supreme Court's *Biggins* decision, I "assume for purposes of this motion that such a claim is cognizable[ ]" as the District Court of Minnesota did in *Leidig*, 850 F.Supp. at 801. *See e.g. Nolting v. Yellow Freight Sys., Inc.*, 799 F.2d 1192 (8th Cir.1986); *Leftwich v. Harris–Stowe State College*, 702 F.2d 686, 690 (8th Cir.1983).

**27.** While plaintiff suggested in his deposition that other members of his department have suffered

from age discrimination, he does not indicate how he has any personal knowledge of such discrimination beyond mere speculation, does not provide any testimony or affidavits from those he claims might also be victims, and phrases his responses to questions about particular persons in terms of "he may be," "it would appear," and "I really don't know. That's why I'm asking the question." (Day Depo 381:9–391:5). In addition, he also admits that all of the highest paid faculty members in the department are older than he, (Day Depo 391:14–16), and that the department does not discriminate against all older faculty members. (Day Depo 381:9–11).

**28.** Normally, a case "arises under" federal law, if federal law creates plaintiff's cause of action. *See American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916); *see also The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411–12, 57 L.Ed. 716 (1913).

437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Additionally, I have concluded that summary judgment is appropriate with respect to each claim raised by Dr. Day which arises under the United States Constitution or federal statute. I shall therefore decline to exercise supplemental jurisdiction over Day's state law contract claim, 28 U.S.C. § 1367(c)(3), and I shall dismiss it without prejudice so that he may refile in an appropriate forum.

**IT THEREFORE HEREBY IS ORDERED:**

1. Defendants' motion for summary judgment (filing 39) is granted with respect to plaintiff's constitutional and age discrimination claims.

2. Plaintiff's state law claim is dismissed without prejudice.